1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOSEPH AUGUST MARSALA,                    No.  2:13-cv-1614 CKD P

12                   Petitioner,

13          v.                                 ORDER

14   HEIDI LACKNER,

15                   Respondent.

16

17          Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas

18   corpus under 28 U.S.C. § 2254.  On May 17, 2010, petitioner was convicted by a jury in Siskiyou

19   County of false imprisonment, battery, torture, assault by means of force likely to produce great

20   bodily injury and dissuading a witness.  He is serving consecutive sentences of 10 years and 8

21   months imprisonment and 7 years-to-life imprisonment.  Respondent filed an answer to the

22   petition, and petitioner filed a traverse.  ECF Nos. 23, 46.  The parties have consented to

23   magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos 6 and 16.  Upon careful

24   consideration of the record and the applicable law, the petition is denied.

25   I.  Factual Background

26          In its affirmation of the judgment on direct appeal, the California Court of Appeal, Third

27   Appellate District summarized the facts presented at trial as follows:

28                  Defendant's convictions stem from his physical abuse of the victim

1

in late May 2009 during an overnight stay at a transient campsite in the woods south of Little Castle Creek and west of Interstate 5 near the Crag View Drive exit. This is in Siskiyou County's southernmost reaches (with Dunsmuir just to the north). On the east side of the interstate (through a culvert for the creek) is a popular local swimming hole.

The victim, in her mid-thirties, had known defendant since her childhood in the Weed region of the county. They began "seeing each other off and on" in summer 2008. She had been addicted to methamphetamine and alcohol since her teens. At the time of the trial, she was experiencing the after-effects of her injuries (including chronic pain, seizures, and poor short-term memory), which required her to take analgesics and psychiatric medications. She also had a preexisting bipolar condition that required medication as well.

In February 2009, the victim and the defendant left town. They met up with the victim's teenage son, who had stolen a car from his foster parents, and the three began a cross-country trip to Missouri (where defendant's father had lived). The victim testified she left Siskiyou County to keep threats of violence away from her grandmother (with whom she lived) and younger child. She told her probation officer at the time that she was afraid the people with whom she had drug dealings were going to kill her.[1] Defendant left to avoid charges for inflicting great bodily harm on Cliff Taylor.[2] On the way, they stopped in Las Vegas for a couple of days, where the family of defendant's stepfather lived. They stayed in Missouri for a few weeks, after which the victim and her son returned to California by bus.

When defendant returned to California, the victim joined him reluctantly in Sacramento. She wanted to keep him away from her grandmother, because his behavior had become volatile while they were in Missouri. They camped for a while in the foothills while defendant panned for gold. The victim testified that defendant was being verbally and physically abusive.

Defendant had not been using drugs up to this point. After they had been in the foothills for a couple of months, defendant's brother and his girlfriend met up with them.[3] The quartet stayed a night at a

---

[1]  At trial, the victim asserted defendant had kidnapped her at gunpoint from her home. Although encountering numerous individuals in her travels with defendant and her son, there is an absence of any evidence that she mentioned this to any of them, as defendant points out (without contradiction from the People).

[2]  Taylor testified that defendant had hit him in the face with a baseball bat. Apparently, this took place in March 2008, and was the subject of a separate case that was consolidated into the present one. The record is unclear about its disposition and the parties do not refer to it.

[3]  Neither testified at trial.

2

"pink motel," where defendant inflicted physical abuse on the victim.[4]   At some point the following day, the victim asked the girlfriend to get them back to Siskiyou County because defendant would kill her if they left them behind.  Defendant started hitting her in the car in front of the others.  The victim said she was getting badly bruised, and the quartet spent the following night at a different motel; the victim testified the brother was concerned that defendant's behavior "was going to get them pulled over, and [defendant's] brother told him, 'You can't do this in public.  You have to do this in private.'"  Again, defendant subjected the victim to physical abuse throughout the night.   Although she was screaming to draw attention, no one responded.

The following day, defendant was smoking drugs as they drove in the brother's girlfriend's car.  Defendant began hitting the victim in front of the others, and continued his verbal abuse.  At one point, the girlfriend stopped the car because she could not tolerate defendant's behavior any longer.  Although the victim pleaded with the other two to put a stop to the abuse, neither said anything to defendant.  They drove north on Interstate 5, stopping only once in Williams at a gas station (where defendant threatened to break the victim's jaw if she sought help) before they reached the exit for the Little Castle Creek encampment in the late afternoon.  The victim again pleaded with the others not to leave her there with defendant.  When a truck—parked nearby—departed, defendant punched her in the jaw.

Defendant forced the victim toward the encampment, striking her in the head and back as they walked through the culvert.  However, defendant calmed down for a few hours.  After it grew dark, someone parked a car at the swimming hole and honked.  The victim assumed it was defendant's brother, because defendant returned with drugs.  After taking them, defendant became "mean and explosive."  He beat her continuously during the night and following day of their stay.  She began to have seizures.[5]

On the following afternoon, defendant encountered a group of teenagers near the culvert, and asked them to call the police to summon medical assistance for his companion.   When they followed him to the campsite, he claimed Taylor (his great bodily injury victim) had beaten her.  He has also told the victim to give the same explanation to the paramedics when they arrived (the victim knew Taylor from past drug purchases).[6]  She accordingly told this to a paramedic and a detective, alluding to being a casualty of a "drug war."

---

[4]  A motel employee came to defendant's and the victim's room that night to reprimand them for smoking.  The employee did not see any signs of bruising or other indications of violence.

[5]  The victim testified that defendant had also set her belongings on fire and raped her, though the jury did not convict defendant of either crime.

[6]  Taylor denied knowing the victim or selling drugs to her, and claimed he had not been in the vicinity of the swimming hold and encampment for six years.

Defendant had left before assistance arrived, telling a witness that he needed to pursue the attacker.  He later told a detective that an unknown assailant had attacked the victim in his absence, and the impetus for his flight was his outstanding warrant for inflicting great bodily injury.

When examined at the hospital, the victim had bruising over her entire body, a fractured nose, and a subdural hematoma.  The victim also tested positive for methamphetamine.  While the victim told a detective that defendant had rubbed her face with creosote, the examination did not find any signs of this.  The victim also testified defendant had cut her genitalia with a sharp object, but an exam a week after her rescue did not show any signs of this.

Lodged Document ("Lod. Doc.") 5 at 2-7;[7] see also People v. Marsala, No. C 065614, 2012 WL 592920 at *1-3 (Cal. App. 3d Dist. Feb. 23, 2012).

II.     Procedural Background

Following a jury trial in the Siskiyou County Superior Court, petitioner was convicted of false imprisonment (as a lesser included offense of kidnapping for purposes of rape), misdemeanor battery (as a lesser included offense of rape), torture, assault by means of force likely to produce great bodily injury, and dissuading a witness.  Lod. Doc. 5 at 1.  The jury found the charged enhancements for inflicting great bodily injury and for having served two prior prison terms to be true.  Id.  The jury also returned a verdict of not guilty on charges of attempted murder, the making of criminal threats, and arson.  Id.

The trial court sentenced petitioner to state prison with indeterminate term of life imprisonment with the possibility of parole after seven years, and a consecutive determinate term of ten years and eight months.

Petitioner appealed the judgment to the California Court of Appeal, Third Appellate District.  Lod. Doc. 1.  With the exception of making a modification to pretrial custody credits, the appellate court denied petitioner's claims on the merits and affirmed his sentence.  Lod. Doc. 5.

/////

_____

[7] Lodged documents refer to documents lodged by respondent on March 11, 2015.  ECF No. 24.

1     Petitioner filed a petition for review in the California Supreme Court.  Lod. Doc. 6.

2   On May 16, 2012, the California Supreme Court denied review.  Lod. Doc. 7.

3     Petitioner filed a state habeas petition in the Siskiyou County Superior Court on August 2,

4   2013, which was denied in a written decision on September 6, 2013.  Lod. Docs. 8, 9.  Petitioner

5   filed a second state habeas petition in the California Court of Appeal, Third Appellate District on

6   November 1, 2013, which was summarily denied on November 7, 2013.  Lod. Docs. 9, 10.

7   Petitioner filed a third state habeas petition in the California Supreme Court on February 18,

8   2014, which was summarily denied on May 14, 2014.  Lod. Doc. 10.

9     Petitioner filed the instant federal habeas petition on August 5, 2013.  ECF No. 1.  He

10   subsequently filed the operative first amended petition on April 7, 2014.  ECF No. 12.

11   Respondent filed an answer on March 11, 2015.  ECF No. 23.  Petitioner filed a traverse on July

12   2, 2015.  ECF No. 46.

13   III.    Standard For Habeas Corpus Relief

14     An application for a writ of habeas corpus by a person in custody under a judgment of a

15   state court can be granted only for violations of the Constitution or laws of the United States.  28

16   U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any claim decided on the

17   merits in state court proceedings unless the state court's adjudication of the claim:

18         (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established federal law, as
19         determined by the Supreme Court of the United States; or

20         (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
21         State court proceeding.

22   28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)").  It is the habeas petitioner's burden to

23   show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S.

24   19, 25 (2002).

25     The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.

26   As the Supreme Court has explained:

27         A federal habeas court may issue the writ under the "contrary to"
           clause if the state court applies a rule different from the governing
28         law set forth in our cases, or if it decides a case differently than we

> have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

When a state court rejects a federal claim without addressing the claim, a federal court presumes the claim was adjudicated on the merits, in which case § 2254(d) deference is applicable.  Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).  This presumption can be rebutted.  Id.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law.  "Clearly established" federal law is that determined by the Supreme Court.  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is appropriate to look to lower federal court decisions as persuasive authority in determining what law has been "clearly established" and the reasonableness of a particular application of that law.  Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court precedent is misplaced).

/////

/////

1   III.  Arguments and Analysis

2        A.  Prosecutorial Misconduct

3        First, petitioner argues that his due process rights were violated as a result of a number of

4   instances of misconduct by the prosecution during petitioner' state court trial.  Specifically,

5   petitioner argues that the prosecution engaged in the following instances of misconduct: (1) made

6   an inaccurate comment that petitioner's case was a "Three Strikes" case in a newspaper article

7   published while jury selection was ongoing; (2) delayed discovery of the victim's supplemental

8   statement made to the prosecution's investigator; (3) withheld witness Ruth Kellner's address

9   from petitioner; (4) intercepted confidential defense communications; (5) engaged in witness

10  tampering; (6) knowingly elicited perjured testimony from the victim and witness Mellissa

11  Skallerud; (7) made impermissible inferences in her closing argument; (8) failed to disclose or

12  preserve exculpatory evidence; (9) attempted to use petitioner's post-arrest silence against him;

13  (10) failed to provide victim's medical history; (11) improperly attempted to elicit prior bad acts

14  testimony; and (12) engaged in pervasive misconduct (collectively "prosecutorial misconduct

15  claims").

16            1.  Procedural Default

17       As an initial matter, respondent argues that all of petitioner's prosecutorial misconduct

18  claims are procedurally defaulted because the state habeas court denied these claims when

19  petitioner raised them for the first time based on an independent and adequate state procedural

20  rule.

21       The procedural default doctrine forecloses federal review of a state prisoner's federal

22  habeas claims if those claims were defaulted in state court pursuant to an independent and

23  adequate state procedural rule.  See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).

24  Generally, "federal habeas relief will be unavailable when (1) 'a state court [has] declined to

25  address a prisoner's federal claims because the prisoner had failed to meet a state procedural

26  requirement,' and (2) 'the state judgment rests on independent and adequate state procedural

27  grounds,'"  Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Coleman, 501 U.S. at 729-30).

28  A state procedural rule is "adequate" only if it is clear, consistently applied, and well established

7

at the time of petitioner's default.  Walker, 562 U.S. at 316; Calderon v. United States Dist.

Court, 96 F.3d 1126, 1129 (1996).  The respondent bears the burden of proof with respect to the

"adequacy" of a state procedural bar.  Bennett v. Mueller, 322 F.3d 573, 585-86 (9th Cir. 2003).

"[A] procedural default does not bar consideration of a federal claim on either direct or habeas

review unless the last state court rendering a judgment in the case 'clearly and expressly' states

that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989).

Furthermore, a federal habeas court may still consider the merits of an otherwise procedurally

defaulted claim if the petitioner successfully makes a showing of "cause" and "prejudice."

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012) ("A prisoner may obtain federal review of a

defaulted claim by showing cause for the default and prejudice from a violation of federal law.").

Here, respondent argues that petitioner's prosecutorial misconduct claims are procedurally

defaulted because the state habeas court denied them on the basis of the independent and adequate

state procedural rule that plaintiff had failed to raise any of them on direct appeal.  Respondent's

argument is well taken.

The record shows that petitioner failed to raise any of his prosecutorial misconduct claims

on direct appeal.  See Lod. Docs. 1, 2, 3.  Instead, petitioner first raised these claims in his state

habeas petition filed in the Siskiyou County Superior Court.  See Lod. Doc. 8.  In denying his

petition, the Siskiyou County Superior Court provided the following rationale:

> A petition for habeas corpus will be dismissed if it alleges an issue
> that could have been, but was not, raised on direct appeal. Habeas
> corpus is not available to review claims of insufficiency of evidence
> or claims concerning trial court's rulings or procedural errors,
> which should be presented on direct appeal.  In re Lindley (1947)
> 29 Cal.2d 709.
>
> Further any issue that was actually raised and rejected on appeal
> cannot be renewed in a petition for a writ of habeas corpus. In re
> Harris (1993) 5 Cal.4th 813.

Lod. Doc. 9.

////

////

1    Petitioner also asserted these claims in his subsequent habeas petitions before the

2    California Court of Appeals, Third Appellate District and the California Supreme Court, but

3    petitioner's petitions were denied by both courts without comment.  Lod. Docs. 9, 10.

4    Accordingly, the Siskiyou County Superior Court's was the last reasoned state court decision on

5    petitioner's prosecutorial misconduct claims.  See Vansickel v. White, 166 F.3d 953, 957 (9th

6    Cir. 1999) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)) (to determine whether a claim

7    is procedurally barred, the court looks to the last reasoned state court opinion addressing that

8    claim).

9        More importantly, the Siskiyou County Superior Court denied petitioner's prosecutorial

10   misconduct claims on the adequate and independent state law procedural ground that petitioner

11   failed to assert those claims on direct appeal, and instead raised them for the first time in his state

12   habeas petition.  In Ex Parte Dixon, 41 Cal.2d 756 (1953), the California Supreme Court held that

13   a criminal defendant cannot assert claims in a state habeas petition that "could have been, but

14   were not, raised upon a timely appeal from a judgment of conviction."  Id. at 759.  Recently, the

15   U.S. Supreme Court held that this procedural rule the California Supreme Court announced in

16   Dixon is an adequate and independent state procedural bar sufficient to bar a claim from federal

17   habeas review under the procedural default doctrine.  Johnson v. Lee, 136 S. Ct. 1802 (2016) (per

18   curiam).

19       While the state habeas court here did not cite directly to the procedural rule set forth in

20   Dixon, it nevertheless provided a plain statement of the substance of the procedural rule set forth

21   in that case as its rationale for denying petitioner's claims that he had not previously raised on

22   direct review, which included his prosecutorial misconduct claims.  Lod. Doc. 9 ("A petition for

23   habeas corpus will be dismissed if it alleges an issue that could have been, but was not, raised on

24   direct appeal.").  Accordingly, the state habeas court's decision adequately demonstrates that that

25   court relied on the Dixon rule as a reason for dismissing any of petitioner's claims that he had not

26   previously raised, thus barring any of petitioner's prosecutorial misconduct claims asserted in his

27   present federal petition.  See Harris, 489 U.S. at 263 (quoting Caldwell v. Mississippi, 472 U.S.

28   320, 327 (1985)) (holding that procedural default bars a claim asserted in a federal habeas petition

9

1   when "the last state court rendering a judgment in the case 'clearly and expressly' states that its

2   judgment rests on a state procedural bar").

3          Petitioner argues that any procedural default on his prosecutorial misconduct claims

4   should be excused because his appellate counsel acted deficiently by declining to raise the claims

5   on direct appeal despite petitioner's insistence that he do so.  In support of this argument,

6   petitioner attaches to his petition a copy of a letter his appellate counsel wrote to him stating that

7   his counsel declined to include many of the prosecutorial misconduct claims petitioner raises in

8   the present petition as claims in petitioner's appellate brief on direct appeal in state court because

9   his counsel believed those claims to lack merit.  ECF No. 12 at 149-53.

10          A demonstration of ineffective assistance of counsel is sufficient to establish cause to

11  excuse a procedural default if the petitioner's counsel was "so ineffective as to violate the Federal

12  Constitution."  Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (citing Murray v. Carrier, 477

13  U.S. 478, 488-89 (1986)).  However, as discussed in more detail below with regard to the merits

14  of petitioner's separate ineffective assistance of appellate counsel claim, petitioner fails to show

15  that his counsel acted in a manner that was constitutionally deficient such that petitioner's

16  procedural default is excused.  Indeed, as discussed below, petitioner's multitude of prosecutorial

17  misconduct claims all are without merit.  Therefore, petitioner's appellate counsel did not act

18  deficiently in deciding to not raise those claims on direct appeal.  See Miller v. Keeney, 882 F.2d

19  1428, 1434 (9th Cir. 1989) ("In many instances, appellate counsel will fail to raise an issue

20  because she foresees little or no likelihood of success on that issue; indeed, the weeding out of

21  weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.").

22  Because petitioner fails to demonstrate that his appellate counsel acted deficiently, petitioner's

23  procedural default with respect to his prosecutorial misconduct claims is not excused.

24  /////

25  /////

26  /////

27  /////

28  /////

2.  Claims on the Merits

In addition to being procedurally defaulted, petitioner's 12 prosecutorial misconduct claims all lack merit for the reasons discussed below.

a.  Made an Inaccurate Comment that Petitioner's Case was a "Three Strikes" Case in a Newspaper Article Published While Jury Selection was Ongoing

Petitioner first argues that the prosecutor engaged in misconduct in violation of petitioner's right to due process when she made an inaccurate remark to a reporter that petitioner's case was a "Three Strikes" case due to the nature of the charged felonies that was published in a local newspaper while jury selection was still ongoing in petitioner's criminal case. Petitioner asserts that the prosecutor's erroneous comment effectively tainted the jury pool for his criminal trial because there was no way of definitively knowing whether the prospective jurors, and, ultimately, the members of the jury pool that were empaneled and rendered the verdict, had read the article.

The Supreme Court has held that:

> Due process requires that the accused receive a trial by an impartial jury free from outside influences . . . .  The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences . . . .  Neither prosecutor, counsel for defense, the accused, witnesses, court staff nor the enforcement officers coming under the jurisdiction of the court, should be permitted to frustrate its function.

Sheppard v. Maxwell, 384 U.S. 333, 362-63 (1966).  However, in order to rise to the level of a due process violation, the conduct must "render th[e] trial fundamentally unfair."  Darden v. Wainwright, 477 U.S. 168, 193 (1986); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Furthermore, the jury's exposure to news accounts of the charged crime, standing alone, will not presumptively deprive the defendant of due process.  Skilling v. United States, 561 U.S. 358, 380 (2010) (citing Murphy v. Florida, 421 U.S. 794, 798-99 (1975)).  Instead, the defendant must show "that actual bias infected the jury that tried him."  Skilling, 561 U.S. at 398.

11

1    Here, after the news article containing the prosecutor's comment was brought to the trial

2 judge's attention during the voir dire process, he decided to question each prospective juror as to

3 whether he or she had read the newspaper article containing the prosecutor's "Three Strikes"

4 comment.  Lod. Doc. 12 at 872-73.  If any prospective juror responded that he or she had

5 reviewed or read the text of the article, then the trial court would dismiss that juror.  Id. at 873.

6 All 12 members of the jury and the 3 alternative jurors who were ultimately empaneled and

7 rendered a verdict in petitioner's case stated that they had not read the article when asked by the

8 judge during voir dire.  Id. at 874.

9    Petitioner raised this claim in a motion to dismiss before the state trial court at the

10 conclusion of jury selection, and the trial court rejected it as meritless.  Lod. Doc. 11 at 325-30;

11 Lod. Doc. 12 at 872-74.  In short, the trial court found that the jury had not been tainted by the

12 article because "no member of the jury and . . . none of the three alternate jurors in this case in

13 any way read the article."  Lod. Doc. 12 at 874.  Because the trial court took appropriate measures

14 to reasonably ensure that none of the jurors who ultimately rendered a verdict in petitioner's case

15 read the article with the prosecutor's erroneous "Three Strikes" comment, the prosecutor's

16 conduct in providing comments to the newspaper did not render petitioner's trial fundamentally

17 unfair.  Nor was the jury tainted by the article such that it was unable to impartially render its

18 verdict.

19    Petitioner argues, however, that the measure the trial court took in questioning the jurors

20 regarding the whether they had read the article was an inadequate remedy to address potential

21 jury bias because the jurors could have simply lied that they had not read the article.  However,

22 the trial court found as a matter of fact that none of the jurors or alternative jurors ultimately

23 empaneled in petitioner's case had read the article at issue.  Lod. Doc. 12 at 874.  Federal courts

24 sitting in habeas are required to presume that the determination of a factual issue by the state

25 court is correct and the petitioner has "the burden of rebutting the presumption of correctness by

26 clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Petitioner fails to provide any evidence

27 to support his claim that the jurors lied other than his own conjecture based on the fact that

28 community from which the jurors were selected was small and the article was published in the

12

1   local paper, which was a means of spreading information quickly within that community.  This is

2   insufficient to meet the high "clear and convincing evidence" standard required to rebut the trial

3   court's factual finding.  Therefore, petitioner's argument is without merit.

4        Finally, for the first time in his traverse, petitioner appears to make the additional

5   argument that the jury was tainted further because the article noted that the Siskiyou County

6   Superior Court's website listed murder as a charge, which was incorrect since petitioner had only

7   been charged with attempted murder.  Petitioner contends that the trial court did not question any

8   of the potential jurors on whether they had seen the article's claim that petitioner was charged

9   with murder, therefore there was no way of knowing whether the jurors had seen and been

10  negatively influenced by it.

11       As an initial matter, it is not appropriate to raise new arguments in a traverse.  Cacoperdo

12  v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).  Therefore, petitioner's newly-raised argument

13  is improperly presented.  Moreover, none of the jurors who decided his case actually read the

14  article, therefore meaning that they did not read the article's mention of the murder charge.

15  Furthermore, the copy of the article attached to the operative petition shows that while the article

16  noted that the trial court's website listed the case as a murder case, it also noted that this statement

17  was contradicted by a police report that stated that petitioner was charged with attempted murder,

18  thus accurately indicating to the reader that petitioner was charged with attempted murder rather

19  than murder.  ECF No. 12 at 106.  Finally, even had the jurors read the article or the court

20  website's listing, no actual prejudice could have arisen because the jury acquitted petitioner on

21  the attempted murder charge and all murder-related charges, and there is nothing in the record

22  indicating that any of the jurors were biased by a belief that petitioner was a murderer.  Lod. Doc.

23  11 at 605-06.

24       In short, petitioner fails to show that the prosecutor's comments in the published

25  newspaper article tainted the jury or otherwise rendered his trial fundamentally unfair.  Therefore,

26  this claim is without merit.

27  /////

28  /////

13

b. Delayed Discovery of the Victim's Supplemental Statement made to Detective Blaney

Next, petitioner argues that the prosecution violated the rule announced by the Supreme Court in Brady v. Maryland, 373 U.S. 83 (1963) when she belatedly produced a supplemental report by the prosecutor's investigator, Detective Rachel Blaney, that summarized statements made by the victim about her travel to Missouri with petitioner.

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." 373 U.S. at 87. Since Brady, the Supreme Court has clarified that the duty to disclose is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985), and that the rule covers information "known only to the police investigators and not the prosecutor." Kyles v. Whitley, 514 U.S. 419, 438 (1995). "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

Here, during the trial, the victim testified that she had traveled with petitioner and her son in a stolen car to Missouri, where they stayed for several months with petitioner's father, who warned her that she needed to get away from petitioner. Lod. Doc. 12 at 1786-87, 1928. The victim also testified that she had told Detective Blaney about these events. Id. at 1790. Petitioner's trial counsel tried to impeach the victim by noting that Detective Blaney's report of her conversations with the victim, which had been provided to petitioner through pretrial discovery, did not contain such information. Id. at 1927-30. However, when petitioner's trial counsel cross-examined Detective Blaney later on in the trial, Detective Blaney testified that the victim had provided statements during a subsequent phone interview that she had traveled with petitioner and her son to Missouri and that petitioner's father had warned her about petitioner. Id.

14

1    at 2115-17.  It was later revealed that Detective Blaney had prepared a supplemental report

2    regarding this additional conversation with the victim and had forwarded that report to the

3    prosecutor, but the prosecutor had not produced the report to petitioner prior to trial and had not

4    read the report herself until after Detective Blaney's initial cross-examination.  Id. at 2498-99.

5           The defense moved for a mistrial or, alternatively, to strike the testimony of both the

6    victim and Detective Blaney, because the prosecution failed to provide petitioner with Detective

7    Blaney's supplemental report prior to trial.  Id. at 2117-28.  After additional briefing and

8    argument on the issue, the trial court ruled that while Detective Blaney's supplemental report

9    should have been provided as part of pretrial discovery and its omission "to some extent

10   undermine[d]" the defense's efforts to impeach the victim, petitioner's only requested remedies,

11   that the trial court either declare a mistrial or strike the entirety of the testimonies provided by the

12   victim and Detective Blaney, were not warranted in light of the circumstances as the statements

13   contained in the supplemental report were "not facially exculpatory" and their delayed disclosure

14   did not "deprive [petitioner] of a fair trial."  Id. at 2498-2501, 2506.  Both the victim and

15   Detective Blaney retook the witness stand after the trial court's ruling on petitioner's motion—

16   after Detective Blaney's supplemental report had finally been disclosed to petitioner—and were

17   subject to further cross-examination regarding the subject of their phone conversation with the

18   benefit of Detective Blaney's supplemental report.  Id. 2615-19, 2665-2727.

19          In light of these facts in the record, petitioner fails to demonstrate a Brady violation.

20   "[T]here is no Brady violation so long as the exculpatory or impeaching evidence is disclosed at a

21   time when it still has value."  United States v. Houston, 648 F.3d 806, 813 (9th Cir. 2011).  The

22   record shows that Detective Blaney's supplemental report was ultimately produced to petitioner,

23   albeit in a delayed fashion, and that both the victim and Detective Blaney retook the stand and

24   were subject to cross-examination after petitioner obtained the report.  Because the supplemental

25   report was disclosed at a time when it still had value, i.e., when petitioner could use it to cross-

26   examine the victim and Detective Blaney, no Brady violation occurred.  See Houston, 648 F.3d at

27   813 ("The government also turned over AUSA Martin's notes from his interview with

28   McConaghy during trial but while cross-examination was on-going. At this point, the notes still

15

1  had evidentiary value to the defense because they could be used—and were used—during cross

2  examination."); United States v. Vgeri, 51 F.3d 876, 880 (9th Cir. 1995) (impeaching evidence

3  disclosed during trial was still valuable because the defense could use it on cross-examination);

4  United States v. Gordon, 844 F.2d 1397, 1403 (9th Cir.1988) (impeaching evidence disclosed

5  after a witness had finished testifying did not constitute a Brady violation because the court had

6  offered to recall the witness for further cross-examination in light of the new impeaching

7  evidence).  Accordingly, petitioner's claim is without merit.

8  c. Withheld Witness Kellner's Address from Petitioner

9  Next, petitioner contends that the prosecution improperly withheld the address of

10  prosecution witness Ruth Kellner, petitioner's ex-girlfriend, by falsely claiming on a pretrial

11  witness list that Kellner had requested her address be withheld from the defense and that all

12  contact with her go through her attorney John Lawrence.  Petitioner argues that the prosecution's

13  withholding of Kellner's address under the claimed false pretenses constituted a Brady violation.

14  As an initial matter, petitioner fails to show how Kellner's address was exculpatory in

15  nature such that its non-disclosure constituted a Brady violation.  Moreover, to the extent

16  petitioner appears to argue that the lack of Kellner's address unduly hindered his ability to present

17  a defense by depriving the defense team access to that witness, the record belies this claim.  The

18  record shows that the defense was given an opportunity to interview Kellner prior to her

19  testimony for the prosecution, but the defense declined to take advantage of this opportunity.

20  Lod. Doc. 12 at 2343.  However, the defense subsequently interviewed Kellner and recalled her to

21  testify as a defense witness.  Id. at 2747-49.  In short, petitioner fails to show how the

22  prosecution's failure to provide petitioner with Kellner's address violated Brady, deprived him of

23  access to Kellner such that he could not adequately present his defense, or violated any of

24  petitioner's other constitutional rights.  Accordingly, petitioner's claim is not well taken.

25  d. Intercepted Confidential Defense Communications

26  Petitioner also argues that the prosecutor engaged in misconduct that unduly prejudiced

27  petitioner and violated his Sixth Amendment right to counsel by intercepting confidential

28  communications between him and his counsel.  Specifically, petitioner contends that the

1   prosecutor engaged in two instances of such behavior: (1) the prosecutor had her investigator,

2   Detective Rees, glance at defense counsel's handwritten notes during the trial, and (2) the

3   prosecutor herself looked through a pile of documents on the defense's table.

4          "The Sixth Amendment provides that an accused shall enjoy the right 'to have the

5   Assistance of Counsel for his defense.' This right, fundamental to our system of justice is meant

6   to assure fairness in the adversary criminal process. [Citations omitted.]" U.S. v. Morrison, 449

7   U.S. 361, 364 (1981).  Governmental conduct must be proved to render counsel's assistance to the

8   defendant ineffective in order to constitute a violation of this right.  Id.  "Sixth Amendment

9   deprivations are subject to the general rule that remedies should be tailored to the injury suffered

10  from the constitutional violation and should not unnecessarily infringe on competing interests."

11  Id.  "In addition, certain violations of the right to counsel may be disregarded as harmless error."

12  Id. at 365; see also U.S. v. Rogers, 751 F.2d 1074, 1078 (1985) ("When the action of Government

13  agents involves a violation of the defendant's constitutional rights and yet does not require

14  dismissal of the indictment, it would follow, a fortiori, that merely inducing a witness to violate

15  an ethical obligation of confidentiality to a client would not require dismissal of the indictment.")

16         More specifically with regard to defense communications, the Supreme Court has held

17  that "when conversations with counsel have been overheard, the constitutionality of the

18  conviction depends on whether the overheard conversations have produced, directly or indirectly,

19  any of the evidence offered at trial."  Weatherford v. Bursey, 429 U.S. 545, 552 (1977).

20  Furthermore, when an agent of the prosecution overhears such conversations, there can be no

21  Sixth Amendment violation "unless [the agent] communicated the substance of the [attorney-

22  client] conversations and thereby created at least a realistic possibility of injury to [the defendant]

23  or benefit to the State."  Id. at 558.

24         Here, petitioner asserts that during trial Detective Rees, the prosecutor's investigator,

25  glanced over at the defense's table and read defense counsel's handwritten notes.  Petitioner

26  claims that he and his counsel were made aware of this conduct when Detective Rees leaned over

27  to petitioner's trial counsel and told petitioner's counsel that his name was not spelled "Reece," as

28  petitioner's counsel had been writing in his notes.  After this happened, petitioner filed a motion

17

1    to dismiss based on an assertion that the prosecutor had violated her duty not to eavesdrop on

2    defense communications.  Lod. Doc. 11 at 471-72.  The trial court held a hearing on this motion,

3    during which petitioner's counsel, the prosecutor, and Detective Rees testified.  Lod Doc. 12 at

4    2456-90.  During his testimony, Detective Rees responded to questioning regarding his viewing

5    of defense counsel's notes by testifying that he had not intentionally read any defense notes and

6    had only inadvertently noticed that his name had been misspelled on the paper pad defense

7    counsel had been writing on because the courtroom's seating arrangements for the prosecution

8    and defense had left him sitting only inches away from defense counsel.  Id. at 2470-75.  After

9    hearing the testimony, other evidence, and the parties' arguments on the matter, the trial court

10   made a factual determination finding Detective Rees's testimony to be true and denied

11   petitioner's motion to dismiss.  Id. at 2488.

12          Petitioner contends that the court's factual finding was incorrect and that Detective Rees

13   lied in in his testimony.  However, under § 2254, "a determination of a factual issue made by a

14   State court shall be presumed to be correct" and the petitioner has "the burden of rebutting the

15   presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

16   Petitioner provides little more than his own conclusory disbelief of Detective Rees's testimony to

17   support his argument.  Such a showing is insufficient to demonstrate that the trial court's factual

18   determination was incorrect under the applicable "clear and convincing evidence" standard.

19          Moreover, even had Detective Rees intentionally glanced at defense counsel's notes and

20   obtained material information regarding defense's trial strategy as petitioner asserts, there is no

21   indication that Detective Rees relayed any of that information to the prosecutor, let alone any

22   suggestion that the prosecutor used such information to produce evidence at trial against

23   petitioner, or used it in a manner that was unduly prejudicial.  Accordingly, even if petitioner's

24   factual assertion were correct, there is no evidence that a Sixth Amendment violation arose out of

25   the Detective Rees's alleged conduct.  See Weatherford, 429 U.S. at 558.

26   /////

27   /////

28   /////

1     With regard to petitioner's assertion that the prosecutor looked through a pile of

2  documents on the defense's desk, petitioner claims that the prosecutor's statement during trial

3  that she knew that the defense team had 18 copies of a particular document on their desk

4  demonstrates that she had previously looked through the defense's documents.  At trial, the

5  prosecutor testified that she knew that the defense had 18 copies of the document because she

6  knew that there needed to be a copy for each of the 12 jurors and 3 alternate jurors and copies for

7  the prosecution, the defense, and the court, not because she had looked at the defense's

8  documents.  Lod. Doc. 12 at 2466-67.  The trial court found the prosecutor's testimony truthful

9  and denied petitioner's motion to dismiss based on the prosecutor's alleged misconduct.  Id. at

10  2488.  As with Detective Rees's alleged conduct, petitioner provides nothing beyond mere

11  conjecture in his petition that the prosecutor lied to support his assertion that she had looked

12  through the defense's documents.  This is insufficient to call into question the trial court's factual

13  determination that the prosecutor had not engaged in such misconduct.  See 28 U.S.C. §

14  2254(e)(1).

15     In short, petitioner fails to show that the above actions by the prosecution violated his

16  Sixth Amendment right to assistance of counsel.  Therefore, his argument is not well taken.

17                          e.  Engaged in Witness Tampering

18     Next, petitioner argues that the prosecutor engaged in witness tampering by suggesting to

19  witness Kellner during a pretrial meeting that petitioner was responsible for the death of Kellner's

20  and petitioner's one-week old daughter in 1997.  Petitioner asserts that this conduct violated his

21  right to due process because the prosecutor made these statements to Kellner in order to influence

22  Kellner's testimony when she testified at trial.

23     During a pretrial interview with Kellner, the prosecutor inquired about the cause of death

24  of Kellner's and petitioner's one-week old daughter in 1997.  The prosecutor raised the topic

25  because the infant's autopsy report showed that she had had fluid in her lungs at the time of her

26  death and a police report from just prior to the baby's birth and death regarding allegations of a

27  domestic dispute between petitioner and Kellner contained a statement by Kellner that Amanda

28  Moro told her that petitioner caused the baby's death when he accidentally hit the unborn child in

1    the womb when trying to hit Kellner.  Lod. Doc. 12 at 2431-34.  Based on this information and

2    the fact that the autopsy report stated that the cause of the infant's death was unknown, the

3    prosecutor thought it necessary to inquire into the infant's death when interviewing Kellner to get

4    her take on what happened.  Id. at 2432.  However, when the prosecutor asked Kellner during the

5    interview whether she wanted to review the autopsy report and answer questions on the subject,

6    Kellner declined.  Id. at 2434.  The prosecutor "accepted and respected" Kellner's refusal to

7    discuss the matter and ended her inquiry into the subject.  Id.

8            Petitioner's trial counsel brought a midtrial motion to dismiss all charges asserting that the

9    prosecutor's inquiry into the infant's death was "outrageous conduct" that violated petitioner's

10   right to due process.  Lod. Doc. 11 at 390-95.  However, the trial court denied the motion

11   following an evidentiary hearing on the issue, finding that "Kellner's testimony was not in any

12   way affected by the conduct of [the prosecutor]."  Lod. Doc. 12 at 1252-54.

13           As the trial court determined, there is no indication that the prosecutor's statements during

14   the pretrial meeting unduly biased Kellner or were otherwise so outrageous as to violate

15   petitioner's right to due process.  Indeed, during trial, Kellner briefly took the stand and testified

16   to petitioner's good character, Lod. Doc. 12 at 2747-50, which indicates that the prosecutor's

17   conduct did not negatively influence Kellner's ability to provide unbiased testimony.

18   Furthermore, Kellner testified at trial that the prosecutor's pretrial inquiry into the death of her

19   child did not in any way impact her trial testimony.  Id. at 2294-96.  Accordingly, petitioner fails

20   to show that the prosecutor's pretrial statements to Kellner unduly prejudiced Kellner to such a

21   degree that her testimony rendered petitioner's trial so fundamentally unfair as to violate due

22   process.

23                   f.  Knowingly Elicited Perjured Testimony from the Victim and Witness

24                       Skallerud

25           Petitioner contends that the prosecutor knowingly elicited false testimony from the victim

26   that petitioner had cut her genitals and from petitioner's ex-girlfriend, Melissa Skallerud, that he

27   had struck her back with a belt.  Petitioner argues that the prosecution's misconduct in soliciting

28   this perjured testimony violated his right to due process.

1        It is well established that a conviction obtained through the prosecution's knowing use of

2    false evidence, including false testimony, violates the Fourteenth Amendment's Due Process

3    clause. Napue v. People of State of Ill., 360 U.S. 264, 269 (1959). Similarly, due process is

4    violated "when the State, although not soliciting false evidence, allows it to go uncorrected when

5    it appears." Id. A new trial is required if "the false testimony could . . . in any reasonable

6    likelihood have affected the judgment of the jury . . ." Id. at 271. In short, due process is

7    violated, and reversal is required, "if (1) the testimony was actually false, (2) the prosecutor knew

8    it was false, and (3) the false testimony was material (i.e., there is a reasonable likelihood that the

9    false testimony could have affected the judgment)." Dow v. Virga, 729 F.3d 1041, 1048 (9th Cir.

10    2013) (citing Napue, 360 U.S. at 271-72).

11            i.      The Victim's Testimony

12        With regard to the victim's testimony, petitioner contends that the victim falsely testified

13    that petitioner had cut her on the exterior of her genitalia during the 2009 campsite incident.

14    Petitioner argues that this statement was false because a hospital report from a week after the

15    incident noted that no cuts were detected during a physical examination. Petitioner argues further

16    that the prosecutor knowingly elicited this false statement because she made the following

17    assertion in her closing argument based on the victim's testimony:

18
19              When inflicting the injury, the defendant intended to cause cruel or
              extreme pain. He cut her genitalia. At the hospital they are more
20              concerned about her head. But it was there, according to the victim.
              One person's testimony is good enough. The doctor has testified
21              that area heals quickly. He has not found it in that length of time.
              It wasn't even dealt with until after she got home from the hospital.

22    Lod. Doc. 12 at 2931.

23        A review of the record fails to support petitioner's assertion that the prosecutor knowingly

24    elicited false material testimony from the victim. First, the record fails to support petitioner's

25    contention that the victim's statement was demonstrably false. At trial, the victim testified that

26    petitioner "had something in his hand," that "[i]t *felt* like he had cut [her] with it," and that she

27    felt "[a] lot of stinging." Lod. Doc. 12 at 1657-58 (emphasis added). The victim further

28

acknowledged during direct examination that no cuts were found on the outside of her genitalia during the physical examination conducted a week after the incident.  Id. at 1665-66.  On cross-examination, she testified that she believed that the cut had healed by the time the physical examination took place.  Id. at 2005.  Prior to the victim's testimony, Dr. Saunders testified that while external injuries to the vaginal area do not heal as quickly as internal injuries, that area still "heals quickly."  Id. at 1379, 1385.  Given this evidence indicating that it was at least conceivable that the victim's purported cut could have healed in the week between the campsite incident and the victim's physical examination, petitioner fails to demonstrate that the victim's statement was actually false.

Moreover, even assuming the victim's testimony regarding the cut was false, the above evidence does not give rise to a reasonable inference that the prosecutor was aware that the victim's testimony was false; the testimony provided a sufficient basis for the prosecutor to make her comments during closing arguments regarding the cut the victim described.

Finally, and most importantly, petitioner fails to show how the victim's statement regarding the cut was material to the outcome of the jury's verdict.  There exists ample evidence in the record of petitioner engaging in other acts of violence against the victim during the 2009 campsite incident that supported the charges against him, including evidence that petitioner had repeatedly hit and kicked the victim over the course of their stay at the campsite, such that there was not a reasonable likelihood that a false statement regarding the cut to the victim's genitalia could have affected the jury's  verdict on any of the charges for which petitioner was found guilty.

ii.      Skallerud's Testimony

Petitioner argues that Skallerud falsely testified that petitioner bruised her back by attacking her with a belt during a domestic violence incident carried out by petitioner against her in 2002.  Petitioner contends that Skallerud's testimony regarding the injuries she received during that incident was contradicted by a medical report.  Specifically, petitioner argues that Skallerud's testimony was refuted by the finding in the medical report that there were no bruises on Skallerud's back.  However, the report petitioner cites to in support of his argument noted that

1   Skallerud had bruising on the upper part of one of her hips.  ECF No. 12 at 145.  Such a minor

2   discrepancy regarding where the bruising was located fails to compellingly show that Skallerud

3   gave false testimony.  Indeed, Skallerud later clarified in her testimony that she had received

4   bruising on her "lower, mid-back region" as a result of petitioner's hitting her with a belt.  Lod.

5   Doc. 12 at 1397.  A plausible inference can be drawn that Skallerud may have considered the

6   location of the bruising identified in the report as being part of her lower back area.

7        Moreover, petitioner merely asserts in a conclusory fashion that the prosecutor was aware

8   of the contradiction, but did nothing to try to correct Skallerud's statement.  Even assuming

9   Skallerud's testimony was false, petitioner provides no evidence plausibly indicating that the

10  prosecutor knowingly elicited, or was even aware of, the alleged perjury.

11       Finally, and most importantly, petitioner fails to demonstrate that the minor discrepancy

12  he highlights with regard to the location of Skallerud's bruises created a reasonable likelihood

13  that the jury's judgment in his case was impacted by Skallerud's allegedly false statement.  The

14  2002 incident between petitioner and Skallerud that was the subject of Skallerud's testimony had

15  no direct bearing on the charges that were brought against petitioner in this case, all of which

16  involved a separate incident between petitioner and the victim in 2009.  Indeed, Skallerud had no

17  involvement in the events that formed the basis for the charges against petitioner and the

18  prosecution only had her testify for the purpose of introducing evidence pursuant to California

19  Evidence Code § 1109 that petitioner had committed prior acts of domestic violence. See Lod.

20  Doc. 12 at 1389-1404.  Accordingly, there was no reasonable likelihood that Skallerud's

21  allegedly false testimony could have impacted the jury's verdict on the charges brought against

22  petitioner.

23       Because petitioner fails to show that the prosecutor either elicited or was aware of and did

24  not correct materially false statements made by either the victim or Skallerud, his due process

25  claim is without merit.

26                    g.  Made Impermissible Inferences in her Closing Argument

27       Petitioner also argues that during her closing argument the prosecutor misrepresented

28  evidence regarding whether petitioner had engaged in sexual relations with the victim.

                                              23

1    Specifically, petitioner asserts that the prosecutor took out of context petitioner's response to a

2    question asked by Detective Rees during an interview regarding whether petitioner had had sex

3    with a female that Detective Rees did not specifically identify.  Petitioner argues that petitioner's

4    affirmative response to the question was with regard to a woman other than the victim; he asserts

5    that his answers to Detective Rees's questions both before and after that question demonstrate

6    that petitioner intended his response to mean that he had had sex with another woman he had been

7    married to on their wedding day in 2002.  Petitioner claims that the prosecutor improperly

8    mischaracterized petitioner's statement during her closing argument to insinuate that petitioner

9    had taken the victim to the campsite in order to rape her so that he could consecrate a marriage.

10         Petitioner asserts that a transcript of his interview with Detective Rees was produced by

11   the prosecution during discovery.  However, petitioner fails to attach a transcript of that interview

12   to his operative petition, did not attach it to any of his previous habeas petitions in state or federal

13   court, and the interview itself was never introduced at trial.  Without any supporting evidence

14   from the record, petitioner's conclusory allegation that the prosecutor mischaracterized his

15   statement to Detective Rees during the interview is insufficient to support his claim.  See James v.

16   Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a

17   statement of specific facts do not warrant habeas relief.").

18         Moreover, a review of the trial record shows that there was evidence introduced at trial

19   from which the prosecutor could have reasonably drawn the inference that she did in her closing

20   argument.  For instance, Detective Rees testified at trial that when he had asked petitioner

21   whether he had had sex with the victim, petitioner stated that he and the victim "were going to get

22   married" and that "it was his wedding day when he left her."  Lod. Doc. 12 at 2557.  Such

23   evidence permitted the prosecutor the latitude to draw from it the inference that she did during her

24   closing argument.  See Ceja v. Stewart, 97 F.3d 1246, 1243 (9th Cir. 1996) ("Counsel are given

25   latitude in the presentation of their closing arguments, and courts must allow the prosecution to

26   strike hard blows based on the evidence presented and all reasonable inferences therefrom.").

27   Therefore, the prosecutor's argument did not improperly manipulate or misstate the evidence.

28   ////

1    Moreover, even assuming that the prosecution lacked evidentiary support for the inference

2    she drew regarding petitioner's motivation for bringing the victim to the campsite, the

3    prosecutor's argument to that effect did not amount to a due process violation.  The Supreme

4    Court has held that it "is not enough that the prosecutors' remarks [be] undesirable or even

5    universally condemned."  Darden, 477 U.S. at 181.  Rather, the improper comments must have

6    "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

7    Id.  Here, the jury ultimately acquitted petitioner of the charges of rape, attempted rape, and of

8    kidnapping for rape, demonstrating that the jurors did not accept the prosecution's theory asserted

9    during closing that petitioner brought the victim to the campsite for the purpose of raping her in

10   order to consecrate their marriage.  Lod. Doc. 11 at 607, 610-11.  Petitioner argues in his traverse

11   that the prosecutor's comment still prejudiced him despite the acquittal of the rape-related charges

12   because he was convicted of the lesser included offense of battery, which could have provided a

13   basis for the jury's guilty verdict with regard to the torture charge.  However, as discussed above,

14   there was ample other evidence introduced regarding petitioner's other acts of violence against

15   the victim during the 2009 campsite incident, such as evidence that petitioner repeatedly hit and

16   kicked the victim over the course of their stay, from which the jury could have reasonably found

17   petitioner guilty of those charges.  Accordingly, petitioner fails to show that there was a

18   reasonable likelihood that the prosecutor's statement during her closing argument unduly affected

19   the jury's verdict.[8]

20                  h.  Failed to Disclose or Preserve Exculpatory Evidence

21          Petitioner contends further that the prosecution improperly: (1) failed to disclose

22   exculpatory evidence that the victim had suffered 11 prior skull fractures; (2) failed to preserve

23   exculpatory evidence showing that petitioner had left gold panning tools at the campsite where

24   _____

25   [8] Petitioner also appears to argue for the first time in his traverse that the prosecutor also
     misrepresented evidence regarding the extent of the victim's prior injuries and whether petitioner
26   had cut the victim's genitalia.  In addition to  the fact that petitioner improperly raises these
     arguments for the first time in his traverse, Cacoperdo, 37 F.3d at 507, they also appear to be
27   duplicative of petitioner's arguments regarding the evidence of the victim's prior skull fractures
     addressed below and the victim's allegedly perjured testimony addressed above.  Accordingly,
28   the court declines to address these arguments with regard to petitioner's current claim.

the 2009 incident took place; and (3) refused to grant immunity to witness Amanda Moro, who

would have testified that petitioner had purchased a metal detector for purposes of gold panning.

i.     Prior Skull Fractures

Petitioner first contends that in violation of <u>Brady,</u> the prosecution improperly suppressed

evidence that the victim had suffered 11 skull fractures prior to the 2009 campsite incident.

During the trial, Detective Blaney testified that the victim had told Detective Blaney that her

doctors had told her that she had suffered 11 separate skull fractures prior to the 2009 incident.

Lod. Doc. 12 at 2667-69.  However, petitioner fails to provide any indication as to what material

evidence the prosecution had in its possession regarding the victim's purported skull fractures or

other prior head injuries that it suppressed.[9]  Indeed, the prosecution noted at trial that it had

provided petitioner with the evidence it had in its possession related to the victim's medical

health.  Lod. Doc. 12 at 1357.  Accordingly, petitioner fails to show that the prosecution

committed a <u>Brady</u> violation.

Petitioner also appears to argue that the prosecution should have presented the information

regarding the victim's prior skull fractures to the jury for purposes of showing that the victim did

not require force likely to cause great bodily injury in order to sustain the injuries she did as a

result of the 2009 campsite incident.  However, the only indication in the record that the victim

had 11 skull fractures was the victim's own statement to Detective Blaney, which conflicted with

other evidence produced at trial.  For example, Dr. Saunders testified that C.T. scans taken of the

victim's face soon after the 2009 campsite incident showed that she had only one nasal fracture

that was consistent with blunt force trauma that was no more than a few weeks old.  Lod. Doc. 12

at 1380-82.  Beyond the victim's own testimony at trial, which conflicted with other evidence,

---

[9] In his traverse, petitioner appears to assert for the first time that the prosecution improperly failed to provide to petitioner a more detailed medical report regarding the extent and impact of the victim's prior head injuries.  Petitioner's use of his traverse to raise this argument for the first time with regard to his claim is procedurally improper.  <u>See</u> <u>Cacoperdo</u>, 37 F.3d at 507. Moreover, this argument is identical to the argument petitioner makes with regard to petitioner's claim that the prosecution withheld documentation of the victim's medical history in violation of <u>Brady</u> that is addressed in detail below.  Therefore, the court declines to address this argument with regard to petitioner's current claim.

26

1    there is no indication that the victim had 11 prior skull fractures.  The prosecution did not

2    improperly misstate the evidence or otherwise distort the fact-finding process by not emphasizing

3    to the jury that the victim had such prior head injuries. Accordingly, petitioner's claim is without

4    merit.

5                        ii.      Gold Panning Equipment

6            Next, petitioner contends that the prosecution's investigators failed to preserve petitioner's

7    gold panning tools that were located at the scene of the 2009 campsite incident in violation of the

8    Supreme Court's rulings in and California v. Trombetta, 467 U.S. 479 (1984) and Arizona v.

9    Youngblood, 488 U.S. 51 (1988).

10           In Trombetta, the Supreme Court held that the government violates a criminal

11   defendant's right to due process when it fails to preserve evidence with "exculpatory value that

12   was apparent before the evidence was destroyed, and [is] of such a nature that the defendant

13   would be unable to obtain comparable evidence by other reasonably available means."  467 U.S.

14   at 489.  In Youngblood, the Supreme Court added the additional requirement that a defendant

15   demonstrate that the police acted in bad faith in failing to preserve the potentially useful evidence.

16   488 U.S. at 58.

17           Here, petitioner argues that he had left gold panning equipment at the scene of the 2009

18   campsite incident that the prosecution's investigators failed to preserve when they initially

19   gathered evidence at the crime scene after the incident.  Petitioner argues that the gold panning

20   equipment was exculpatory in that it corroborated the defense's theory that petitioner was not the

21   one who assaulted the victim because he had been away from the campsite panning for gold at the

22   time she was attacked.  Petitioner also contends that the equipment was likely stolen between the

23   time when the prosecution's investigators failed to secure it during their initial examination of the

24   crime scene on May 28, 2009 and when they returned to investigate the site further on June 11,

25   2009 and did not find any such equipment.

26           Even assuming that the gold panning equipment was present at the crime scene when the

27   investigators initially examined it for evidence, petitioner fails to show how that equipment's

28   exculpatory value was readily apparent to the investigators at that time.  The evidence presented

1    at trial regarding what occurred in the time between when emergency personnel were dispatched

2    to the crime scene and the time of the initial investigation does not suggest that the gold panning

3    equipment had a readily apparent exculpatory value.  Indeed, testimony from witnesses present at

4    the time emergency services arrived on the scene stated that petitioner told them he was present at

5    the campsite during the time the victim was attacked and witnessed the attack himself.  Lod. Doc.

6    12 at 1068, 1126.  There is no evidence that petitioner or anyone else had told law enforcement

7    prior to the initial investigation that petitioner had been gold panning at the time of the incident,

8    nor was there any evidence that reasonably suggested that any gold panning equipment at the

9    campsite otherwise needed to be preserved.  Accordingly, the exculpatory nature of the gold

10   panning equipment petitioner claims was at the campsite would not have been immediately

11   apparent to investigators under the circumstances.

12        Furthermore, petitioner fails to show that the prosecution acted in bad faith in failing to

13   secure the gold panning equipment at the crime scene.  Petitioner first claimed to law

14   enforcement that he had been gold panning at the time of the incident during a post-arrest

15   interview that took place on June 10, 2009.  Lod. Doc. 12 at 2085.  The next day, the

16   prosecution's investigators returned to the crime scene in search of gold panning equipment and

17   did not find any, but did find and preserve several other items.  Id. at 1217, 1243-49.  This

18   evidence, and indeed the rest of the record, does not suggest that the prosecution acted in bad

19   faith when investigating the crime scene.  Therefore, petitioner fails to demonstrate that the

20   prosecution's conduct was in violation of the Supreme Court's holdings in Trombetta and

21   Youngblood.

22                    iii.    Moro's Testimony

23        Petitioner also argues that prospective defense witness Amanda Moro would have taken

24   the stand and testified that petitioner had purchased a metal detector for purposes of gold panning

25   had the prosecution granted her use immunity.  The prosecution did not grant such immunity,

26   however, and Moro invoked her Fifth Amendment right against self-incrimination and declined to

27   testify.  Petitioner claims that the prosecution's failure to grant immunity to Moro was done in an

28   attempt to distort the fact finding process and prevent petitioner from putting on a complete

28

1    defense.

2           As an initial matter, the court notes that petitioner provides no authority or evidence to

3    support his claim. Furthermore, the court is not aware of any clearly established Supreme Court

4    case law that supports petitioner's claim.  While the Ninth Circuit Court of Appeals has

5    recognized that a violation of due process occurs when a prosecutor deliberately refuses to grant

6    testimonial use immunity to a relevant witness for the specific purpose of distorting the fact-

7    finding process, United States v. Sedaghaty, 728 F.3d 885, 916 (9th Cir. 2013), such precedent

8    cannot properly support habeas relief.  Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (quoting

9    Renico v. Lett, 559 U.S. 766, 777 (2010)) ("[C]ircuit precedent does not constitute 'clearly

10   established Federal law, as determined by the Supreme Court . . . .'"); see also Arredondo, 365

11   F.3d at 782 (holding habeas petitioner's "reliance on Ninth Circuit or other circuit authority is

12   misplaced" because 28 U.S.C. § 2254(d)(1) requires a decision that was "contrary to, or involved

13   an unreasonable application of, clearly established Federal law, as determined by the Supreme

14   Court.").

15          Moreover, petitioner's claim still fails even under the Ninth Circuit's standard.  During

16   trial, the defense requested the court to grant use immunity to proposed defense witness Amanda

17   Moro, petitioner's brother's girlfriend, so she could testify that she did not observe petitioner

18   physically harm the victim or hold her against her will while they were all traveling from

19   Placerville to Siskiyou County.  Lod. Doc. 11 at 383-89.  Without immunity, Moro intended to

20   invoke her Fifth Amendment right to silence during cross examination.  Accordingly, petitioner

21   argued at trial that immunity was necessary in order for petitioner to present a complete defense.

22   Id.  The trial court ultimately denied the request for judicial immunity for Moro, finding that

23   testimony was not "clearly exculpatory" or "essential" because the charged offenses arose from

24   petitioner's conduct after he and the victim had been dropped off by Moro at the campsite in

25   Siskiyou County.  Lod. Doc. 12 at 2536-45, 2550.  The trial court did "not find that there has

26   been any government effort to distort the judicial fact-finding process in its decision to not pursue

27   immunity for Ms. Moro under the circumstances of this case."  Id. at 2547, 2550.  This

28   determination was reasonable in light of the Ninth Circuit's case law as Moro's anticipated

29

1    testimony concerned events that occurred before the time the charged offenses allegedly took

2    place and, therefore, was only tangentially related to the case.  Accordingly, petitioner's claim is

3    without merit.

4                          i.  Attempted to use Petitioner's Post-Arrest Silence Against Him

5          Petitioner also asserts that the prosecutor improperly attempted to use petitioner's post-

6    arrest silence against him in violation of the Supreme Court's ruling in Doyle v. Ohio, 426 U.S.

7    610 (1976).

8          A suspect has a constitutional right not to speak to police after he is arrested and given his

9    Miranda warnings.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  As an extension of that right,

10   the Supreme Court held in Doyle that prosecutors are prohibited from commenting on a

11   defendant's post-Miranda silence.  426 U.S. at 618-19; see also United States v. Lopez, 500 F.3d

12   840, 844 (9th Cir. 2007) (noting that a prosecutor's comment on defendant's post-Miranda silence

13   violates Doyle).  The rationale for this rule "rests on the fundamental unfairness of implicitly

14   assuring a suspect that his silence will not be used against him and then using his silence to

15   impeach an explanation subsequently offered at trial."  Wainwright v. Greenfield, 474 U.S. 284,

16   291 (1986) (citation and internal quotation marks omitted) (holding that prosecution may not use

17   defendant's silence during case-in-chief).

18         Here, petitioner contends that the prosecutor improperly elicited testimony from Detective

19   Blaney that referenced petitioner's post-arrest silence.  When the prosecutor asked whether

20   Detective Blaney had asked petitioner during a post-arrest interview how petitioner and the victim

21   "got from Placerville to Dunsmuir," Detective Blaney responded as follows: "He told me that a

22   friend dropped him off at the river, but he refused to name who the friend was."  Lod. Doc. 12 at

23   2715.  Petitioner's defense counsel immediately objected on the ground that it violated Doyle.  Id.

24   After a bench conference was held, the trial court sustained petitioner's objection, struck

25   Detective Blaney's answer from the record, and advised the jury that Detective Blaney's response

26   should not be considered for any purpose in petitioner's case.  Id.

27         The Supreme Court held in Greer v. Miller that a court's use of measures such as those

28   utilized by the trial court in petitioner's case are sufficient to prevent the use of a defendant's

                                                        30

1    post-arrest silence in violation of <u>Doyle</u>.  483 U.S. 756, 764 (1987) (holding that no <u>Doyle</u>

2    violation occurred when "the court explicitly sustained an objection to the only question that

3    touched upon [the defendant's] postarrest silence[, n]o further questioning or argument with

4    respect to [the defendant's] silence occurred, and the court specifically advised the jury that it

5    should disregard any questions to which an objection was sustained").  Like the trial court in

6    <u>Greer</u>, the trial court here sustained petitioner's objection to Detective Blaney's testimony

7    regarding petitioner's silence, permitted no further questioning or argument regarding petitioner's

8    post-arrest silence, and advised the jury to disregard Detective Blaney's testimony on that subject.

9    In short, petitioner's post-arrest silence was not submitted to the jury as evidence from which it

10    was allowed to draw any inferences.  Therefore, no <u>Doyle</u> violation occurred and petitioner's

11    argument regarding the use of his post-arrest silence is without merit.

12                        j.  <u>Failed to Provide Victim's Medical History</u>

13        Petitioner also argues that the prosecutor improperly withheld evidence of the victim's

14    past medical history in violation of the Supreme Court's rulings in <u>Brady</u> and <u>Pennsylvania v.</u>

15    <u>Ritchie</u>, 480 U.S. 39 (1987).  Specifically, petitioner asserts that the prosecution deprived him of

16    his ability to effectively question prosecution witness Dr. Saunders regarding the extent of the

17    victim's previously-existing injuries because Dr. Saunders could no longer recall the specifics of

18    such injuries and did not bring copies of the victim's medical records to refresh his recollection.

19        With regard to petitioner's assertion pursuant to <u>Brady</u>, the trial record demonstrates that

20    the prosecution produced the documents within its possession related to the victim's medical

21    health, including any exculpatory information it had in its possession.  Lod. Doc. 12 at 1357.

22    Indeed, petitioner even acknowledges in both his first amended petition and traverse that the

23    prosecution produced the victim's medical records during discovery.  ECF Nos. 12 at 52, 46 at

24    37.  Petitioner argues, however, that the prosecution should have been required to provide a more

25    detailed medical history.  This argument is without merit; the prosecution did not have a

26    constitutional duty to obtain and produce the more detailed medical information to which

27    petitioner claims he was entitled.  <u>See</u> <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977) (quoting

28    <u>Wardius v. Oregon</u>, 412 U.S. 470, 474 (1973)) ("There is no general constitutional right to

1    discovery in a criminal case, and <u>Brady</u> did not create one; as the Court wrote recently, 'the Due

2    Process Clause has little to say regarding the amount of discovery which the parties must be

3    afforded . . . .'"). If petitioner wanted more information regarding the victim's medical history, it

4    was incumbent upon him to have sought those more detailed records through subpoenas or other

5    proper methods.

6          Similarly, petitioner fails to show how the admission of Dr. Saunders's testimony was

7    contrary to the Supreme Court's holding in <u>Ritchie</u>.  Petitioner appears to argue that his rights

8    under the Sixth Amendment's Confrontation Clause were violated because he was unable to

9    effectively cross-examine Dr. Saunders given the limited information petitioner had with regard

10   to the victim's medical history with which he could prepare his examination and Dr. Saunders's

11   inability to testify to the details of that topic without further information to refresh his

12   recollection.  However, as the Supreme Court provided in <u>Ritchie</u>:

13
14               The ability to question adverse witnesses . . . does not include the
                 power to require the pretrial disclosure of any and all information
15               that might be useful in contradicting unfavorable testimony.
                 Normally the right to confront one's accusers is satisfied if defense
                 counsel receives wide latitude at trial to question witnesses.  In
16               short, the Confrontation Clause only guarantees an opportunity for
                 effective cross-examination, not cross-examination that is effective
17               in whatever way, and to whatever extent, the defense might wish.

18

19   480 U.S. at 52-53 (internal citations and quotation marks omitted).  Here, the record shows that

20   petitioner enjoyed the sort of wide latitude to examine Dr. Saunders and the other witnesses that

21   the Supreme Court in <u>Ritchie</u> found sufficient to meet the Confrontation Clause's requirements.

22   Accordingly, petitioner's argument is without merit.[10]

23   _____

24   [10] Petitioner also appears to argue in his traverse that Dr. Saunders's testimony to the extent he
     was able to provide it failed to meet the standards for expert testimony that the Supreme Court
25   articulated in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  Aside from
     the fact that this claim is inappropriately raised for the first time in petitioner's traverse, <u>see</u>
26   <u>Cacoperdo</u>, 37 F.3d at 507, it also is not cognizable under § 2254.  A federal court may not grant
     habeas relief based on a belief that the state trial court made an incorrect evidentiary ruling under
27   state evidence law.  <u>Briceno v. Scribner</u>, 555 F.3d 1069, 1077 (9th Cir. 2009) (citing <u>Estelle v.</u>
     <u>McGuire</u>, 502 U.S. 62, 67-68 (1991)) ("Our habeas powers do not allow us to vacate a conviction
28   'based on a belief that the trial judge incorrectly interpreted the California Evidence Code in

k. Improperly Attempted to Elicit Prior Bad Acts Testimony

Petitioner contends that the prosecutor impermissibly presented propensity evidence in the form of petitioner's prior acts of drug use and domestic violence, in violation of petitioner's right to due process.

With regard to the evidence of past drug use, witness Kellner speculated during her trial testimony as to whether petitioner had been drinking or doing drugs during a 1997 encounter she had with him. Lod. Doc. 12 at 1418-19. Petitioner's counsel immediately objected to this statement. Id. The trial court sustained the objection, struck the testimony, and instructed the jury to disregard Kellner's statement. Id. With regard to the evidence of domestic violence, Ms. Kellner testified that during the 1997 incident, petitioner hit her while she was 8-months pregnant, an act for which petitioner pleaded guilty to a felony. Id. at 1415-24.

In Estelle v. McGuire, the Supreme Court expressly declined to express an opinion on the issue of whether the Due Process Clause is violated by the admission of prior bad acts evidence to show that the defendant has a propensity to commit a charged crime. 502 U.S. 62, 74 (1991) ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."). Because there does not exist any clearly established Supreme Court precedent providing that a criminal defendant's constitutional right to due process is violated by the introduction of prior bad acts as evidence to show propensity, the state trial court's adjudication was not contrary to or unreasonable in light of clearly established federal law. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (noting that the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ"). Accordingly, petitioner request for habeas relief based on this argument is denied. 28 U.S.C. § 2254(d).

////

---

ruling' on the admissibility of evidence."). Furthermore, the California Supreme Court has expressly declined to adopt Daubert as the applicable standard in California. People v. Wilkinson, 33 Cal.4th 821, 843 (2004); People v. Leahy, 8 Cal.4th 587, 593-604 (1994).

33

1                    l. <u>Engaged in Pervasive Misconduct</u>

2          Based on the instances of prosecutorial misconduct claimed above, petitioner finally

3  asserts that the prosecutor engaged in pervasive misconduct that violated his due process rights.

4  However, for the reasons discussed above, none of petitioner's claims of prosecutorial

5  misconduct have merit.  Furthermore, petitioner fails to demonstrate that any other of the

6  prosecutor's actions amounted to a violation of petitioner's right to due process or any other

7  constitutional right that would warrant habeas relief under § 2254.  Accordingly, petitioner's

8  claim that the prosecution engaged in pervasive misconduct in violation of petitioner's due

9  process and other constitutional rights is without merit.

10         In sum, petitioner's prosecutorial misconduct claims are both procedurally defaulted and

11  without merit.  Therefore, they are denied.

12         B.  <u>Judicial Bias</u>

13         Second, petitioner argues that his right to due process was violated as a result of the state

14  trial court expressing bias against him during his criminal trial.  Petitioner contends that this bias

15  was expressed through the trial court's denial of petitioner's trial motions, sentencing decision,

16  and appointment of counsel to certain witnesses.  More specifically, petitioner asserts that the

17  following seven instances show that the trial court improperly acted with bias against him during

18  his criminal trial:  (1) denied petitioner's motion to dismiss based on the prosecutor's "Three

19  Strikes" comment in the newspaper; (2) denied petitioner's motion to dismiss based on the

20  delayed disclosure of the victim's supplemental statement to Detective Blaney; (3) denied

21  petitioner's motion to dismiss based on the prosecution's withholding of Kellner's address and

22  questioning of Kellner at a meeting; (4) denied petitioner's motion for mistrial based on the

23  victim's outbursts while testifying; (5) refused to dismiss juror number 11 after that juror had

24  glimpsed petitioner in the courthouse hallway; (6) imposed consecutive sentences pursuant to

25  California Penal Code § 654 despite petitioner's objection; and (7) appointed a conflicted attorney

26  to represent petitioner's brother and brother's girlfriend (collectively "judicial bias claims").

27  ////

28  ////

34

1           1. Procedural Default

2          As with his prosecutorial misconduct claims, petitioner did not raise his judicial bias

3 claims until he filed his first state habeas petition, which the state habeas court denied on the

4 adequate and independent state law ground that petitioner had failed to first raise those claims on

5 direct appeal.  See Lod. Docs. 1, 2, 3, 8, 9.  Also similar to his prosecutorial misconduct claims,

6 petitioner argues that any procedural default with regard to his judicial bias claims should be

7 excused as his appellate counsel on direct appeal provided ineffective assistance in declining to

8 raise those claims at that time.  However, as discussed above with regard to the prosecutorial

9 misconduct claims and below with regard to plaintiff's claim for ineffective assistance of

10 appellate counsel, documents attached to petitioner's present habeas petition demonstrate that

11 petitioner's appellate counsel did not act deficiently in refusing to raise the meritless judicial bias

12 claims petitioner now raises.  Accordingly, plaintiff's argument that the procedural default with

13 respect to his judicial bias claims should be excused due to his appellate counsel's conduct is

14 without merit and petitioner's judicial claims are denied under the doctrine of procedural default.

15           2. Claims on the Merits

16          Moreover, even if petitioner's judicial bias claims were not procedurally defaulted, his

17 arguments in support of his claims also lack merit for the following reasons.

18           a. Denied Petitioner's Motion for Dismissal Based on the Prosecutor's

19                "Three Strikes" Comment in the Newspaper

20          Petitioner first argues that the state trial court engaged in misconduct by denying

21 petitioner's motion for dismissal based on the prosecutor's erroneous "Three Strikes" comment

22 published in a local newspaper.  As discussed above with regard to petitioner's prosecutorial

23 misconduct claim based on the prosecutor's comment in the newspaper article, the trial court took

24 reasonable steps to ensure that none of the members of the jury empaneled in petitioner's case

25 had read the article.  The trial court's decision to deny petitioner's motion to dismiss based on the

26 article was reasonable in light of the clearly established Supreme Court precedent.  Furthermore,

27 the trial court's response with regard to assessing whether the jurors were aware of the newspaper

28 article in question was adequate and did not exhibit bias against petitioner.  The trial judge

1    provided a thorough and well-reasoned explanation for why he denied petitioner's motion; there

2    is no evidence whatsoever of any bias towards petitioner.  <u>See</u> Lod. Doc. 12 at 867-75.

3    Accordingly, petitioner's argument is rejected.

4              b.   <u>Denied Petitioner's Motion to Dismiss Based on the Delayed</u>

5                 <u>Disclosure of Detective Blaney's Supplemental Report</u>

6        Second, petitioner argues that the trial court erred by denying his motion to dismiss based

7    on the prosecution's delayed disclosure of Detective Blaney's supplemental report.  As discussed

8    above with regard to petitioner's prosecutorial misconduct claims, the delayed disclosure of

9    Detective Blaney's supplemental report did not constitute a <u>Brady</u> violation.  The trial court

10    similarly found when denying petitioner's motion to dismiss that the belated disclosure of the

11    supplemental report did not constitute a <u>Brady</u> violation.  Lod. Doc. 2498-501.  Because no <u>Brady</u>

12    violation occurred as a result of the prosecution's delayed disclosure, the trial court's dismissal

13    petitioner's motion based on that alleged violation was reasonable in light of the clearly

14    established Supreme Court precedent.  Therefore, petitioner's claim is without merit.

15              c.   <u>Denied Petitioner's Motion to Dismiss Based on the Prosecution's</u>

16                 <u>Withholding of Kellner's Address and Questioning of Kellner at a Pretrial</u>

17                 <u>Meeting</u>

18        Third, petitioner argues that the trial court erred by denying his motion to dismiss on the

19    basis that the prosecution improperly withheld witness Kellner's address and improperly

20    questioned Kellner regarding the 1997 death of her infant child during a pretrial interview.  As

21    discussed above with regard to petitioner's prosecutorial misconduct claims, neither the

22    prosecutor's failure to provide Kellner's address, nor her pretrial questioning of Kellner regarding

23    Kellner's deceased infant violated petitioner's right to due process, or any other federal right.

24    The trial court also reached this conclusion as to both claims in denying petitioner's trial motion.

25    Lod. Doc. 12 at 2450-54.  Accordingly, the trial court's decision was not contrary to clearly

26    established Federal law and petitioner's argument is not well taken.

27    ////

28    ////

1            d.   Denied Petitioner's Motion to Dismiss Based on the Victim's Outbursts

2              while Testifying

3        Fourth, petitioner contends that the trial court violated petitioner's right to due process by

4 denying petitioner's two motions to dismiss based on the victim's outbursts and overall demeanor

5 while testifying at trial. Specifically, petitioner identifies in his petition the following statements

6 as having had an unduly prejudicial impact on his trial: (1) the victim's statement that she was no

7 longer afraid of petitioner because "right now he's in cuffs"; (2) the victim's statement that

8 "there was so much drugs involved" when she described her drive with petitioner, petitioner's

9 brother, and petitioner's brother's girlfriend; and (3) her disavowal of any involvement by

10 "Jordan" regarding the events at issue in the case. Lod. Doc. 12 at 1731, 1733-34, 1736.

11        As an initial matter, the Supreme Court "has not yet made a clear ruling that admission of

12 irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

13 issuance of the writ." Holley, 568 F.3d at 1101. Petitioner asserts that the victim's statements he

14 highlights in his petition constituted overtly prejudicial evidence. Even assuming, arguendo,

15 however, that petitioner correctly characterizes the statements as prejudicial, the trial court's

16 decision to deny petitioner's motion to dismiss on this basis was not contrary to or an

17 unreasonable application of federal law within the meaning of § 2254.

18        Furthermore, petitioner fails to demonstrate that the victim's outbursts and general

19 demeanor during her testimony rendered petitioner's trial unfair to such a degree that it violated

20 petitioner's right to due process. In the context of the many hours of testimony the victim gave

21 and the trial court's apparent need to balance the interest in affording petitioner with a full and

22 fair ability to cross-examine the victim with the victim's ability to undergo examination given her

23 fragile mental state, it cannot be reasonably said that the statements petitioner contests gave rise

24 to the sort of undue prejudice needed to sustain a due process claim. Moreover, with regard to the

25 second and third statements petitioner contests, the trial court struck them from the record and

26 advised the jury to disregard them after an objection was raised by petitioner's counsel. Lod.

27 Doc. 12 at 1733, 1736. In short, the state trial court properly rejected petitioner's motions for

28 mistrial based on the victim's outbursts and general demeanor while testifying as such behavior

1  did not deprive petitioner of a fair trial.  Accordingly, petitioner's claim on this basis is without

2  merit.

3           e.  <u>Refused to Dismiss Juror Number 11 after that Juror had Glimpsed</u>

4           <u>Petitioner in the Courthouse Hallway</u>

5         Fifth, petitioner argues that the trial court improperly refused to dismiss juror number 11

6  after that juror had allegedly glimpsed petitioner in the courthouse hallway while petitioner was

7  being escorted in handcuffs.

8         Generally, "courts cannot routinely place defendants in shackles or other physical

9  restraints visible to the jury."  <u>Deck v. Missouri</u>, 544 U.S. 622, 633 (2005).  "[T]he Fifth and

10  Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial

11  court determination, in the exercise of its discretion, that they are justified by a state interest

12  specific to a particular trial."  <u>Id.</u> at 629.  Without a particularized determination showing that

13  shackling is justified, visible shackling in the courtroom is "'inherently prejudicial.'"  <u>Id.</u> at 635

14  (quoting <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967)).  Nevertheless, the Ninth Circuit Court

15  of Appeals, interpreting the Supreme Court's holding in <u>Deck</u>, has recently held that some jurors'

16  viewing of the defendant being transported in shackles through the courthouse's public areas does

17  not deprive the defendant of a fair trial in violation of due process.  <u>Wharton v. Chappell</u>, 765

18  F.3d 953, 966 (9th Cir. 2014); <u>see also</u> <u>Ghent v. Woodford</u>, 279 F.3d 1121, 1133 (9th Cir.2002)

19  (holding that there was no inherent prejudice where "a few jurors at most glimpsed [defendant] in

20  shackles in the hallway and as he was entering the courtroom"); <u>Castillo v. Stainer</u>, 983 F.2d 145,

21  148 (9th Cir. 1992) (holding that, concerning "a brief and accidental viewing of the defendant in a

22  corridor, chained [at the waist]," "[n]o harm that rises to a constitutional level is done by such an

23  unintended, out-of-court occurrence"); <u>United States v. Halliburton</u>, 870 F.2d 557, 559-61 (9th

24  Cir.1989) (holding that a "brief and inadvertent display of [defendant] in handcuffs" when "he

25  was observed handcuffed to a codefendant by at least two jurors as the elevator doors opened"

26  was not inherently prejudicial).

27         Here, petitioner merely contends that juror number 11 briefly glimpsed him in handcuffs

28  in the courthouse hallway when passing by.  This occurrence did not give rise to a violation of

1   petitioner's due process rights.  See Deck, 544 U.S. 622; Wharton, 765 F.3d at 966; Ghent, 279

2   F.3d at 1133; Castillo, 983 F.2d at 148; Halliburton, 870 F.2d at 559-61.

3       Nor did the trial court's refusal to dismiss juror number 11 exhibit the sort of bias

4   petitioner asserts.  Indeed, after the incident occurred, the trial judge held a brief hearing during

5   which he asked juror number 11 whether he had observed petitioner outside the courtroom, to

6   which juror number 11 stated he had not.  Lod. Doc. 12 at 1405.  Later, after juror number 11

7   gave the court a note stating that he remembered that he had actually seen petitioner in the

8   hallway, the trial judge expressed concern that questioning the juror on what he had observed

9   could lead him to draw a prejudicial inference against petitioner and, therefore, declined to

10  conduct a further inquiry.  Id. at 1482-83.  The trial judge similarly declined to conduct such an

11  inquiry when it was brought to his attention that other jurors might have seen petitioner in the

12  hallway for the same reason expressed with regard to juror number 11, but would address the

13  issue if it later appeared that the situation warranted such intervention.  Id. at 1566-67.  Such

14  actions on the trial court's part do not demonstrate the existence of the sort of judicial bias

15  petitioner asserts.

16      Moreover, petitioner fails to point to any evidence in the record plausibly showing that

17  juror number 11 saw petitioner in restraints when he glimpsed petitioner in the hallway.  Indeed,

18  petitioner's claim is directly refuted by the record and the attachments to the operative first

19  amended petition.  For instance, when the court questioned the bailiff regarding the procedure

20  that was used to transport petitioner to the courtroom, the bailiff responded that petitioner was

21  unshackled and unchained at the bottom of the hall such that he was unrestrained by the time he

22  was brought through the hallway near the courtroom.  Lod. Doc. 12 at 1309-10, 1412, 1567.

23  Furthermore, petitioner's own counsel on appeal noted in his letter to petitioner attached to the

24  petition that there was "*no evidence* that [the jurors] had seen [petitioner] in shackles."  ECF No.

25  12 at 150 (emphasis in original).  After a review of the record, the court agrees and finds

26  petitioner's assertion regarding juror number 11 to lack merit.

27  ////

28  ////

39

1        f. <u>Imposed Consecutive Sentences Pursuant to California Penal Code §</u>

2        <u>654 Despite Petitioner's Objection</u>

3        Petitioner also argues that the trial court exhibited bias when it overruled petitioner's

4  objection to the imposition of consecutive sentences under California Penal Code § 654.  As an

5  initial matter, the court notes that "[t]he decision whether to impose sentences concurrently or

6  consecutively is a matter of state criminal procedure and is not within the purview of federal

7  habeas corpus."  <u>Cacoperdo</u>, 37 F.3d at 507 (citing <u>Ramirez v. Arizona</u>, 437 F.2d 119, 120 (9th

8  Cir. 1971)); <u>see also</u> <u>Watts v. Bonneville</u>, 879 F.2d 685, 687 (9th Cir. 1989) (holding that federal

9  courts cannot review a claim that a consecutive sentence violated California Penal Code § 654

10  "because 28 U.S.C. § 2254(a) authorizes the federal courts to grant habeas corpus relief only for

11  violations of federal law").  Accordingly, insofar as petitioner asserts that the state court's

12  decision to impose a consecutive sentence was in violation of § 654, such a claim is not

13  cognizable under § 2254.[11]

14        In addition, the trial court's decision to impose a consecutive sentence does not display

15  judicial bias as petitioner asserts.  During sentencing, the trial judge provided an extensive

16  explanation— that separate violent acts supported each conviction—for his decision to sentence

17  petitioner consecutively.  Lod. Doc. 12 at 3074-76, 3098-3109, 3117-3126.  Nothing in the record

18  indicates that the trial court acted with undue bias in rendering this sentencing decision.

19  Accordingly, petitioner's argument is not well taken.

20        g. <u>Appointed Conflicted Attorney to Represent Petitioner's Brother and</u>

21        <u>Petitioner's Brother's Girlfriend</u>

22        Finally, petitioner asserts that the trial court violated his Sixth Amendment right to

23  counsel by appointing an attorney, John Lawrence, to represent petitioner's brother, John Anon,

24  and petitioner's brother's girlfriend, Amanda Moro, who had a conflict due to his "familiarity"

25  with the prosecutor.  ECF No. 12 at 60-61.  Petitioner argues that this familiarity caused

---

26  [11] In an apparent acknowledgement of this fact, petitioner states in his traverse that he "digresses

27  on the issue" after having reviewed the case law respondent cites to in her answer.  ECF No. 46 at
47.  The court construes this response as an acknowledgement by petitioner that his claim is based

28  entirely on state law and, therefore, is not cognizable under § 2254.

1    Lawrence to coerce Anon and Moro to refuse to testify on petitioner's behalf.  This argument is
2    not well taken for two reasons.

3         First, petitioner cites to a series of email communications between Lawrence and the
4    prosecutor attached to his operative first amended petition in support of his argument that in no
5    way show that Mr. Lawrence had a "conflict" that would have caused him to improperly coerce
6    Anon or Moro into not testifying on petitioner's behalf.  See ECF No. 12 at 116-26.  Indeed, the
7    email chain attached to the petition consists merely of a conversation between Lawrence and the
8    prosecutor arranging for the prosecutor to meet with Ruth Kellner, another witness in the case
9    represented by Mr. Lawrence.  Id.  Moreover, the record shows that Moro was not represented by
10   Lawrence, but by another appointed attorney, William Duncan, and remained ready and willing to
11   testify on petitioner's behalf throughout the trial on the condition that she be granted testimonial
12   immunity.  Lod. Doc. 12 at 1515, 1524-27, 1531-33.  With regard to Anon, the prosecution
13   attempted to call him as a witness against petitioner, but he invoked his Fifth Amendment right
14   against self-incrimination.  Id. at 1517-22, 1528-30, 1537-50.  Later, the defense stated its intent
15   to have Anon to testify, but the prosecution objected and stated its intent to impeach Anon if he
16   testified.  Lod Doc. 11 at 505-13.  Ultimately, the defense rested without calling Anon.  Lod Doc.
17   12 at 2845.  Nothing in the record remotely suggests that Lawrence conspired with the prosecutor
18   to coerce Anon and Moro into not testifying.  Moreover, nothing suggests that the trial court acted
19   with undue bias towards petitioner in appointing Lawrence to represent Anon and other
20   prospective witnesses.

21        Second, and more importantly, petitioner fails to point to any clearly established Supreme
22   Court precedent indicating that a court's appointment of a conflicted attorney to represent
23   prospective defense witnesses violates a criminal defendant's Sixth Amendment right to counsel.
24   Indeed, petitioner himself appears to concede in his traverse that no such precedent exists.  ECF
25   No. 46 at 47.  Because there is no clearly established Supreme Court precedent to support his
26   claim that his Sixth Amendment right to counsel was violated, petitioner's argument is without
27   merit.

28   ////

In sum, petitioner's judicial bias claims are both procedurally defaulted and lack merit. Therefore, they are denied.

C.  Ineffective Assistance of Appellate Counsel

Third, petitioner contends that the appellate counsel that represented him on direct appeal in the California Court of Appeal, Third Appellate District and California Supreme Court was ineffective because he failed to raise the prosecutorial misconduct and judicial bias claims petitioner presents above.

1.  Legal Standards

The Supreme Court has enunciated the standards for judging ineffective assistance of counsel claims.  See Strickland v. Washington, 466 U.S. 668 (1984).  First, a defendant must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 688.  To this end, the defendant must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690.  The court must then determine, whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id.  Second, a defendant must affirmatively prove prejudice.  Id. at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.; see also United States v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985); United States v. Schaflander, 743 F.2d 714, 717-718 (9th Cir. 1984) (per curiam).

As to ineffective assistance claims in the federal habeas context, the Supreme Court has instructed:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S., at ----, 129 S. Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness

1

> under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

2

3

4   <u>Harrington v. Richter</u>, 131 S. Ct. 770, 787-788 (2011) (parallel citations omitted).

5                    2.    <u>Discussion</u>

6        With regard to petitioner's claim that his appellate counsel acted deficiently by not raising

7   the prosecutorial misconduct and judicial bias claims he asserts above, the court notes that those

8   claims lack merit for the reasons discussed above.   Defense counsel has no constitutional

9   obligation to raise every frivolous, or even non-frivolous, issue requested by the defendant.  <u>Jones</u>

10  <u>v. Barnes</u>, 463 U.S. 745, 751-54 (1983).  Moreover, as the Ninth Circuit Court of Appeals has

11  noted, "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little

12  or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely

13  recognized as one of the hallmarks of effective appellate advocacy." <u>Miller v. Keeney</u>, 882 F.2d

14  1428, 1434 (9th Cir. 1989).  As discussed above with regard to petitioner's prosecutorial

15  misconduct claims, the petition here shows that plaintiff wrote to his appellate counsel requesting

16  his counsel to raise some of the prosecutorial misconduct and judicial claims he currently asserts,

17  to which his counsel responded that he would not raise such claims as he had conducted research

18  regarding their viability and determined that they would have little likelihood of success.  ECF

19  No. 12 at 149-53.  Accordingly, the mere fact that petitioner's appellate counsel declined to raise

20  the non-meritorious claims petitioner asserts above does not establish that his counsel was

21  ineffective.  <u>See id.</u>  Furthermore, because petitioner's multitude of prosecutorial misconduct and

22  judicial bias claims are without merit, petitioner cannot show that he suffered prejudice as a result

23  of his appellate counsel's refusal to raise those claims on direct appeal.  Because petitioner cannot

24  demonstrate that his appellate counsel's actions were constitutionally deficient and show that

25  those actions were prejudicial, petitioner's ineffective assistance of appellate counsel claim is

26  denied.

27  ////

28  ////

43

D. Failure to Give Calcrim 350 Jury Instruction

Fourth, petitioner argues that the state trial court improperly refused to instruct the jury using Calcrim 350, which instructs on how a jury is to consider evidence of a criminal defendant's good character, in violation of petitioner's Fourteenth Amendment rights to due process and equal protection.

1. State Court Decision

The California Court of Appeal, Third Appellate District summarized the facts underlying this claim and ruled as follows:

> In the course of settling instructions, defendant asserted that he was entitled to an instruction on evidence of his good character. When asked for the evidentiary basis for the instruction, defense counsel replied, "I believe there's been testimony by [defendant's stepgrandfather]. There was various witnesses talking about . . . them being a happy, loving couple," otherwise specifying, however, only an ex-girlfriend who testified that defendant "was a good guy." The trial court found this testimony did not "ris[e] to the level of a character trait that is normally encompassed by" the instruction. (CALCRIM No. 350.)
>
> In the referenced testimony,[12] the stepgrandfather described defendant and the victim as being affectionate with one another while they stayed a couple of days with him in Las Vegas in the spring of 2009. An ex-girlfriend of defendant's had testified (pursuant to Evid. Code, § 1109) that defendant had hit her in the mouth in 1997 in Dunsmuir when she was eight months pregnant with their child (for which he later pleaded guilty to a felony).[13] However, she also testified as a defense witness, asserting that she did not have any continuing fear of defendant, and made him the godfather of her child with an unnamed brother of defendant's.

*A. State Law*

---

[12] On appeal, defendant does not attempt to identify any other testimony in this vein. We note, however, defendant's natural father similarly described the couple's behavior as affectionate during the visit to him in Missouri.

[13] A second ex-girlfriend also testified (pursuant to Evid. Code, § 1109) that defendant had struck her two to three times on her back with a belt in 2002 during the course of an argument, after which she engaged in multiple acts of sexual intercourse with him (though later reporting the incident to the police).

1

2       As <u>People v. Bell</u> (1875) 49 Cal. 485 (<u>Bell</u>) observed, "It is
        important in every criminal case, and especially so when the

3       inculpatory proof is circumstantial in its character, that the jury
        should be instructed, if the prisoner so request, that in determining

4       whether or not he is guilty beyond a reasonable doubt, his good
        reputation, if he have such, as to traits involved in the charge,

5       should be weighed as any other fact established, and that it may be
        sufficient to create a reasonable doubt as to his guilt.  Whether or

6       not, in the particular case in hand, it would do so, was a question for
        the consideration of the jury . . . . [T]here may be cases so made out

7       that no character, however high, can make them doubtful, while
        there may be other cases in which a high character would produce a

8       reasonable doubt, when without it, the evidence [otherwise] might
        be considered as establishing guilt beyond a reasonable doubt."

9       (<u>Bell</u>, at p. 490; accord, <u>People v. Jones</u> (1954) 42 Cal.2d 219, 224
        (<u>Jones</u>).)

10

11      Generally, a defendant may present evidence of character in the

12      form of opinion or reputation evidence, but not in the form of
        specific acts.  (<u>Jones</u>, <u>supra</u>, 42 Cal.2d at p. 224; <u>People v. Felix</u>

13      (1999) 70 Cal.App.4th 426, 431-432; <u>People v. Honig</u> (1996) 48
        Cal.App.4th 289, 348; Evid. Code, § 1102.)  However, <u>People v.</u>

14      <u>Callahan</u> (1999) 74 Cal.App.4th 356, 379 (<u>Callahan</u>), held that
        where the prosecution has introduced propensity evidence in the

15      form of uncharged specific criminal sexual acts (Evid. Code, §
        1108), a defendant was entitled *in rebuttal* to introduce *any* "of the

16      three types of character evidence—opinion evidence, reputation
        evidence, and *evidence of specific incidents of conduct*."  (Italics

17      added.)

18
        From this defendant argues the proposition that, in light of the

19      prosecution's introduction of the evidence of the two acts of
        uncharged domestic violence (Evid. Code, § 1109), the testimony

20      regarding specific instances of his kindly behavior with the victim
        became admissible as rebuttal good character evidence.  These

21      specific instances, in turn, were substantial evidence in support of
        the requested pattern instruction (which flows from <u>Bell</u>) that

22      directs a jury to take this evidence into account in deciding the issue
        of reasonable doubt.

23

24      The People, after we directed them to respond to this issue in

25      supplemental briefing, assert <u>Callahan</u> involved admission of the
        evidence rather than determining whether the evidence was

26      sufficient to warrant instruction on reasonable doubt from good
        character evidence.  It is true <u>Callahan</u> does not directly make any

27      reference to the latter; however, we believe it is necessarily implicit
        within <u>Callahan</u>'s discussion of admissibility that the excluded

28

45

1   evidence (asking the niece of a defendant charged with molesting
2   another whether he had ever touched her inappropriately) would
    have warranted an instruction on the effect of the evidence.
3   Otherwise, there would not have been any purpose in reaching the
    issue.  The People also argue in conclusory fashion that the
4   testimony of the stepgrandfather and ex-girlfriend "shed little if any
    light on [defendant's] proclivity for beating women."  This may be
5   true of the stepgrandfather's two-day contact, but does not apply to
    the father's observations over a period of several weeks, or the ex-
6   girlfriend's present comfort level despite past physical abuse.
    Tautologically, specific acts are specific acts, not reputation or
7   opinion.  The People in point of fact are disputing the weight we
    should accord this evidence, not its sufficiency to support an
8   instruction.
9
    Ultimately, however, while we agree with the logic of defendant's
10  proposition, we do not find the refusal of the instruction to be
    prejudicial.  The present case is certainly not among those where
11  "the inculpatory proof is circumstantial in its character," and is one
    of those "cases so made out that no character, however high, can
12  make them doubtful."  (Bell, supra, 49 Cal. at p. 490.) The late
    Justice Jefferson (an authority on evidence) has described even the
13  more pervasive good character evidence of reputation or opinion as
    having only "slight" probative value "at best." (People v. Pic 'll
14  (1981) 114 Cal.App.3d 824, 892, reversed on different grounds in
15  People v. Pic'l (1982) 31 Cal.3d 731, 734-735.)  The mere incidents
    of good character in the present case were from two witnesses who
16  had at best only limited opportunities to observe defendant's overall
    behavior with the victim, and a third who was the mother of
17  defendant's brother's child.  The victim's testimony provided *direct*
18  evidence of guilt if credited.  A physician testified that the victim
    had injuries that corroborated her account of at least the attack at
19  the campground.  Evidence of third party involvement was weak.
    We are convinced a more favorable result would not be reasonably
20  probable if a jury were instructed to consider the specific instances
21  of good character on the question of reasonable doubt about the
    victim's credibility.
22
23                           B.   Federal Law

24  Defendant contends that deprivation of his entitlement to an
    instruction on good character and reasonable doubt under Bell
25  violated his federal right to due process, relying on Hicks v.
    Oklahoma (1980) 447 U.S. 343.  However, as People v. Breverman
26  (1998) 19 Cal.4th 142, 170-172, explained at length, the erroneous
27  refusal to give an instruction on a lesser included offense to which a
    defendant might be entitled under state law merely implicates the
28  factfinding process and therefore does not deprive a defendant of

                                 46

1

2

3

4

> any liberty interest as in <u>Hicks</u> (which involved the deprivation of a
> procedural sentencing right).  What is true of an instruction
> regarding a lesser included offense is true of a pinpoint instruction
> linking evidence of good character with the burden of reasonable
> doubt.

5

6

7

8

9

10

11

12

13

14

15

16

> Alternately, defendant argues a violation of his right to equal
> protection as compared with "defendants in other cases, where
> courts have held that [those] defendants [were] entitled to [the] jury
> instruction . . . ."  At our direction, the People responded on the
> merits of this claim, invoking <u>Beck v. Washington</u> (1962) 369 U.S.
> 541 [8 L.Ed.2d 98].  The cited pages lay to rest defendant's attempt
> to assert a violation of equal protection.  Responding to the
> litigant's claim that the failure to provide certain state procedural
> protections against a biased grand jury unconstitutionally
> discriminated against him, the United States Supreme Court tersely
> observed in <u>Beck</u>, "the petitioner's argument here comes down to a
> contention that Washington law was misapplied.  Such
> misapplication cannot be shown to be an invidious discrimination.
> We have said time and again that the Fourteenth Amendment does
> not 'assure uniformity of judicial decisions . . . [or] immunity from
> judicial error . . . .' [Citation.]  Were it otherwise, every alleged
> misapplication of state law would constitute a federal constitutional
> question."  (<u>Beck</u>, at pp. 554-555 [8 L.Ed.2d at p. 110].)  Defendant
> similarly cannot transform what may have been instructional error
> into error of constitutional magnitude.

17

Lod. Doc. 5 at 12-18.

18

        2.  <u>Legal Standards</u>

19

      A challenge to jury instructions does not generally state a federal constitutional claim.

20

<u>See</u> <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107,

21

119 (1982)); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is

22

unavailable for alleged error in the interpretation or application of state law.  <u>Middleton</u>, 768 F.2d

23

at 1085; <u>see also</u> <u>Hayes v. Woodford</u>, 301 F.3d 1054, 1086 (9th Cir. 2002); <u>Lincoln v. Sunn</u>, 807

24

F.2d 805, 814 (9th Cir. 1987).  However, a "claim of error based upon a right not specifically

25

guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief

26

where its impact so infects the entire trial that the resulting conviction violates the defendant's

27

right to due process."  <u>Hines v. Enomoto</u>, 658 F.2d 667, 672 (9th Cir. 1981) (citing <u>Quigg v.</u>

28

<u>Crist</u>, 616 F.2d 1107 (9th Cir. 1980)); <u>see also</u> <u>Prantil v. California</u>, 843 F.2d 314, 317 (9th Cir.

1    1988) (stating that to prevail on such a claim petitioner must demonstrate that an erroneous

2    instruction "so infected the entire trial that the resulting conviction violates due process.").  The

3    analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a

4    due process violation is similar to the analysis used in determining whether an error had "a

5    substantial and injurious effect" on the outcome of the trial.  See McKinney v. Rees, 993 F.2d

6    1378, 1385 (9th Cir. 1993).

7        In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

8    'undesirable, erroneous, or even universally condemned,' but must violate some due process right

9    guaranteed by the fourteenth amendment."  Prantil, 843 F.2d at 317 (quoting Cupp v. Naughten,

10   414 U.S. 141, 146 (1973)).  In making its determination, this court must evaluate the challenged

11   jury instructions "'in the context of the overall charge to the jury as a component of the entire trial

12   process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

13   1984)).  The Supreme Court has cautioned that "not every ambiguity, inconsistency, or deficiency

14   in a jury instruction rises to the level of a due process violation."  Middleton v. McNeil, 541 U.S.

15   433, 437 (2004).  Furthermore, in reviewing a challenged instruction, the court "must inquire

16   'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

17   way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

18   U.S. 370, 380 (1990)); see also United States v. Smith, 520 F.3d 1097, 1102 (9th Cir. 2008).

19                    3.  Discussion

20       As an initial matter, the court notes that petitioner argues that the court's refusal to instruct

21   the jury on Calcrim 350 violated California state law.  A violation, misapplication, or

22   misinterpretation of state law, without more, cannot provide a basis for habeas relief under §

23   2254.  Estelle, 502 U.S. at 67-68; see also Middleton, 768 F.2d at 1085; Hayes, 301 F.3d at 1086;

24   Lincoln, 807 F.2d at 814.  Accordingly, to the extent petitioner's claim is premised on his

25   argument that the trial court violated state law by not instructing the jury using Calcrim 350, it is

26   denied.

27       Petitioner also argues that the trial court's refusal to instruct the jury using Calcrim 350

28   violated the clearly established federal rule set forth by the Supreme Court's ruling in Hicks v.

1    <u>Oklahoma</u>, 477 U.S. 343 (1980).  In <u>Hicks</u>, the Court held that a state statute requiring sentencing

2    by jury, and providing the jury with sentencing discretion, created a liberty interest protected by

3    the Due Process Clause.  <u>Id.</u> at 346.  It further held that the petitioner in that case was denied his

4    due process right to discretionary jury sentencing when the trial judge instructed the jury that it

5    must impose a 40 year sentence pursuant to a recidivist statute that was declared unconstitutional

6    during the pendency of petitioner's direct appeal, and the appellate court did not remand for

7    resentencing.  <u>Id.</u> at 347.

8           Here, petitioner identifies no Supreme Court precedent that specifies or even considers the

9    issue of whether a court's failure to provide an instruction on good character to which a defendant

10   might be entitled under state law under circumstances similar to those presented here violates the

11   Due Process Clause.  Nor has petitioner identified any clearly established federal law that applies

12   <u>Hicks</u> to an analogous situation.  While the Supreme Court "has held that such testimony alone, in

13   some circumstances, may be enough to raise a reasonable doubt of guilt and that *in the federal*

14   *courts* a jury in a proper case *should* be so instructed," <u>Michelson v. United States</u>, 335 U.S. 469,

15   476 (1948) (citing <u>Edgington v. United States</u>, 164 U.S. 361 (1896) (emphasis added), it has not

16   mandated that such a jury instruction be given in order to protect a defendant's due process rights,

17   nor has it even indicated that state courts should provide such an instruction under certain

18   circumstances. The state appeals court here distinguished the Supreme Court's holding in <u>Hicks</u>

19   from the circumstances presented in petitioner's case on the basis that the trial court's refusal to

20   provide the good character instruction merely implicated the fact-finding process and therefore

21   did not deprive petitioner of any liberty interest as in <u>Hicks</u>. Lod. Doc. 5 at 16-17.  In light of the

22   lack of clearly established Supreme Court precedent on this subject, it cannot be said that the state

23   appellate court's ruling was an unreasonable application of <u>Hicks</u> or other clearly established

24   federal law.  <u>See</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from

25   this Court …, it cannot be said that the state court 'unreasonbl[y[ appli[ed] clearly established

26   Federal law.").

27          Moreover, as the state appeals court noted in its decision, "[t]he mere incidents of good

28   character in the present case were from two witnesses who had at best only limited opportunities

1   to observe defendant's overall behavior with the victim, and a third who was the mother of

2   defendant's brother's child." Lod. Doc. 5 at 16.  In contrast, "[t]he victim's testimony provided

3   *direct* evidence of guilt if credited," and a physician's testimony regarding the nature of the

4   victim's injuries corroborated her account of at least the attack at the campground. Lod. Doc. 5 at

5   16 (emphasis in original.)  Furthermore, the trial court instructed the jury on petitioner's

6   presumption of innocence, the prosecution's burden of proof beyond a reasonable doubt, and the

7   insufficiency of bad character evidence standing alone to prove guilt. Lod. Doc. 11 at 546, 569-

8   70.  In light of the strong evidence indicating petitioner's guilt, the weak evidence of good

9   character presented by the defense at trial, and the instructions given to the jury, it is not

10  reasonably probable that the omission of Calcrim 350 from the trial court's instructions to the jury

11  had a "substantial and injurious effect or influence in the determining the jury's verdict." Brecht

12  v. Abrahamson, 507 U.S. 619, 637 (1993).

13        Petitioner also argues that the trial court's failure to provide the instruction violated the

14  Equal Protection Clause of the Fourteenth Amendment.  As the state appeals court discussed,

15  petitioner's argument on this basis is essentially an assertion that he was singled out by being

16  denied a procedural safeguard afforded under California state law, i.e., a jury instruction

17  regarding the use of evidence of good character.  Such misapplication cannot be shown to be an

18  invidious discrimination.  The Supreme Court has held "time and again that the Fourteenth

19  Amendment does not 'assure uniformity judicial decisions (or) immunity from judicial error . . . .

20  Were it otherwise, every alleged misapplication of state law would constitute a federal

21  constitutional question." Beck v. Washington, 369 U.S. 541, 554-55 (1962) (citation omitted).

22  Here, the state appeals court reasonably applied this clearly established precedent to deny

23  petitioner's equal protection claim. Lod. Doc. 5 at 18.  Accordingly, petitioner's request for

24  habeas relief on this basis is denied.

25        E.  Admission of Hearsay Evidence

26        Fifth, petitioner argues that the trial court erroneously admitted evidence of a recorded

27  phone call between the victim and petitioner's brother, John Anon, as statements against penal

28  interest pursuant to California Evidence Code section 1230.  Petitioner argues that the admitted

1   statements from this phone conversation were inadmissible hearsay because they did not

2   specifically disserve Anon's penal interest and there was insufficient evidence of their reliability.

3        Absent some federal constitutional violation, a violation of state law does not provide a

4   basis for habeas relief.  Estelle, 502 U.S. at 67-68.  Accordingly, federal court may not grant

5   habeas relief based on a belief that the state trial court made an incorrect evidentiary ruling under

6   state evidence law.  Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) (citing Estelle, 502

7   U.S. at 67-68) ("Our habeas powers do not allow us to vacate a conviction 'based on a belief that

8   the trial judge incorrectly interpreted the California Evidence Code in ruling' on the admissibility

9   of evidence.").  Because petitioner bases his claim regarding this evidence solely on the assertion

10  that the trial court erroneously applied California Evidence Code section 1230, petitioner fails to

11  assert a cognizable claim for habeas relief pursuant to § 2254.  Therefore, his claim is denied.

12       F.  Failure to Grant Use Immunity

13       Sixth, petitioner argues that his right to due process was violated when the state trial court

14  refused to grant testimonial use immunity to prospective defense witness Amanda Moro, the

15  girlfriend of petitioner's brother, who plaintiff claims would have testified that she did not

16  observe petitioner assault the victim while they were all traveling from Placer County to Siskiyou

17  County and did not believe that the victim was held against her will at that time.

18       1.  State Court Decision

19       The California Court of Appeal, Third Appellate District summarized the facts underlying

20  this claim and ruled as follows:

21           During trial, defense counsel challenged the prosecution's
    willingness to grant use immunity to the victim but not to the
22           girlfriend of defendant's brother.  In his motion, defense counsel
    represented that the brother's girlfriend could provide evidence
23           contradicting the victim,[14] but would assert her privilege against
    self-incrimination if called to testify.  Defense counsel contended
24           the court should grant judicial use immunity over the prosecutor's
    objection (the prosecutor being unwilling to allow the brother's
25           girlfriend to escape potential liability as an accomplice).

26

27  [14] Defense counsel attached his investigator's report to the motion, which related an interview
    with the girlfriend.  In essence, the girlfriend claimed she did not observe physical abuse.  The
28  parties stipulated to use of the report as an offer of proof.

The court held a foundational hearing to determine the extent to which the brother's girlfriend would testify in the absence of a grant of immunity.  In the brief examination that the prosecutor conducted before the court recessed for the weekend, the girlfriend refused to answer questions about her own drug use during the period in question or defendant's use of drugs.

When the hearing continued, the parties debated whether the witness was entitled to assert the privilege.  The attorney appointed for the brother's girlfriend suggested the prosecutor ought to be able to tailor the cross-examination to avoid any admission on the part of the witness about her own drug use or drug use in her car.  However, the prosecutor insisted these subjects were essential to effective cross-examination.  Appointed counsel agreed that the girlfriend's own drug use was inexorably entwined with her observations during the time she spent with defendant and the victim.  Defense counsel conceded this was a legitimate basis to assert the privilege.  The prosecutor represented that she would move to strike direct testimony if there was an assertion of privilege in cross-examination.

Determining that the parties were in agreement that the witness would thus be unavailable absent a judicial grant of use immunity, the court entertained argument before deciding (under criteria hypothetically developed for the application of judicially granted use immunity) that the girlfriend's proposed testimony was not clearly exculpatory or essential to the defense, and that the girlfriend's possible role as an accomplice presented a strong countervailing interest on the part of the prosecution against a grant of immunity.  The court declined to find that the prosecutor was attempting to distort the factfinding process in refusing to grant immunity to her.

Defendant renews the issue on appeal.  He contends the trial court abused its discretion in evaluating the factors set forth in People v. Hunter (1989) 49 Cal.3d 957, 974 (citing from Government of Virgin Islands v. Smith (3d Cir.1980) 615 F.2d 964, 972) as applying if a court has the power to grant use immunity over a prosecutor's objections.  Defendant admits that our Supreme Court has consistently avoided the question of whether a court has power to grant use immunity to implement a defendant's right to due process under federal or state law, and that the theory has fallen on stony jurisprudential ground other than in Smith.[15]  He nonetheless asks us to engage in the academic exercise of determining if the

---

[15] E.g., People v. Stewart (2004) 33 Cal.4th 425, 468 (and state cases cited therein); see United States v. Santini (3d Cir.1992) 963 F.2d 585, 598, footnote 6 (listing uniform rejection of judicially granted use immunity in decisions of the other federal circuits).

1

2

> trial court properly resolved the criteria for this presently
> nonexistent right.

3

4

5

6

> Defendant has made his record in the trial court and preserved the
> issue on appeal.  We reject his argument on the simple ground that,
> absent a ruling to this effect from the Supreme Court, defendant
> does not have any such right presently under any controlling state
> or federal authority.  Defendant may now press the issue in the
> proper forum.

7

(Lod. Doc. 5 at 18-20.)

8

      2.  Discussion

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

     As the state appeals court determined, and respondent persuasively argues, there exists no federal authority, let alone clearly established Supreme Court precedent, requiring, or even permitting, a trial court to grant use immunity to a prospective defense witness when the prosecution has refused to immunize the witness, even when the prospective witness will likely provide testimonial evidence that is beneficial or even essential to the defense's case.  Indeed, the Supreme Court has not yet issued an opinion holding that a trial court is even permitted to grant use immunity to a prospective defense witness over the prosecution's objections, let alone requiring a court to grant such immunity under the circumstances petitioner asserts.  See United States v. Quinn, 728 F.3d 243, 247 (3d Cir. 2013) ("No statute or Supreme Court ruling authorizes judicial grants of immunity for a defense witness.").  Furthermore, virtually every federal court of appeals that has addressed the issue, including the Ninth Circuit Court of Appeals, has held that the trial court does not have the power to grant use immunity, nor does it have the power to force the government to grant such immunity.  E.g., U.S. v. Medina, 731 F.2d 1412, 1414 (9th Cir. 1984) ("Lacking the authority to foreclose executive branch discretion in this area, a district court has neither the power to grant use immunity to individuals whom the defendant seeks to call as witnesses, nor the power to force the government to grant such immunity."); United States v. Capozzi, 883 F.2d 608, 614 (8th Cir. 1989); Mattheson v. King, 751 F.2d 1432 (5th Cir.1985), cert. dismissed, 475 U.S. 1138 (1986); United States v. Hunter, 672 F.2d 815, 818 (10th Cir. 1982); United States v. Turkish, 623 F.2d 769 (2d Cir.1980).  But

28

1    see Quinn, 728 F.3d at 247 (overturning own case law permitting a trial court to immunize a

2    defense witness under certain circumstances and joining the other circuits in rejecting judicial use

3    immunity, but retaining five-part test that permits courts to determine whether the prosecution

4    engaged in misconduct by refusing to grant use immunity).

5           Because there exists no clearly established Supreme Court precedent that required, or even

6    permitted, the trial court to grant Moro use immunity to compel her to testify in furtherance of

7    petitioner's case at trial—and the lower court case law on the subject indicates that no such

8    authority exists—petitioner fails to show that the state court's denial of his due process claim

9    based on such a theory was unreasonable within the meaning of § 2254.  Accordingly, petitioner's

10   claim is denied.

11          G.  Cumulative Error

12          Finally, petitioner contends that all of the errors he alleges above cumulatively prejudiced

13   him at trial to such a degree that he was denied a fair trial in violation of his right to due process.

14          The Supreme Court has clearly established that the combined effect of multiple trial court

15   errors violates due process where it renders the resulting criminal trial fundamentally unfair.

16   Chambers v. Mississippi, 410 U.S. 284, 302-03 (1973).  Due process may be violated by the

17   cumulative effect of multiple errors even where no single error rises to the level of a

18   constitutional violation or would independently warrant reversal.  Id. at 290, n.3.  However, a

19   claim of cumulative error warrants habeas relief only where the errors have "so infected the trial

20   with unfairness as to make the resulting conviction a denial of due process."  Donnelly v.

21   DeChristoforo, 416 U.S. 637, 643 (1974).  In other words, the combined effect of the errors must

22   have a "substantial and injurious effect or influence on the jury's verdict."  Brecht v.

23   Abrahamson, 507 U.S. 619, 637 (1993) (internal quotations omitted).

24          Here, petitioner fails to show that the rejection of this claim by the California Court of

25   Appeal, Third Appellate District and the California Supreme Court was contrary to the clearly

26   established Supreme Court precedent.  While neither state appeals court explicitly addressed

27   petitioner's cumulative error claim when he raised it on direct appeal, they both necessarily

28   rejected it by upholding the judgment.  As discussed above, none of petitioner's numerous claims

1   have merit.  Moreover, even when the conduct of the prosecution, trial court, witnesses, and jury

2   that forms the basis for petitioner's claims is considered cumulatively, it cannot be reasonably

3   asserted that such conduct had a "substantial and injurious effect or influence on the jury's

4   verdict" such that the verdict would have been different in the absence of all, or even some, of

5   that conduct.  Brecht, 507 U.S. at 637; see also U.S. v. Rivera, 900 F.2d 1462, 1471 (9th Cir.

6   1990) ("[A] cumulative error analysis should evaluate only the effect of matters determined to be

7   errors, not the cumulative effect of non-errors."). Accordingly, it was not unreasonable for the

8   state court to find that any of the conduct that forms the basis of petitioner's claims, even when

9   considered in combination, did not so infect the trial with unfairness as to violate due process.

10          Accordingly, IT IS HEREBY ORDERED that:

11          1.  Petitioner's petition for writ of habeas corpus is denied;

12          2.  This case is closed; and

13          3.  The court declines to issue the certificate of appealability referenced in 28 U.S.C. §

14              2253.

15   Dated:  September 7, 2016

16                                          _____
                                            CAROLYN K. DELANEY
17                                          UNITED STATES MAGISTRATE JUDGE

18

19   11 marsala1614.hc

20

21

22

23

24

25

26

27

28

55